UNITED STATES of America,
Plaintiff-Appellee,

v.

David A. FELDMAN,
Defendant-Appellant.

No. 84–1460.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 7, 1984.

Decided March 4, 1985.

John R. Wing, Weil, Gotshal & Manges, New York City, for defendant-appellant.

Andrea L. Davis, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUDAHY, POSNER and COFFEY, Circuit Judges.

CUDAHY, Circuit Judge.

In 1981 a jury found the appellant guilty of nineteen counts of mail fraud and nine counts of wire fraud under 18 U.S.C. §§ 1341 and 1343. He was sentenced to eighteen months imprisonment and five years probation. This court affirmed the conviction. 711 F.2d 758. Appellant entered a motion, in the district court, for a new trial based on newly discovered evidence. He appeals now from the denial of that motion.

## I.

In 1977 David Feldman was an option broker for Merrill Lynch, Pierce, Fenner & Smith ("Merrill Lynch") in Chicago. His neighbor and good friend, George Joyner, was a controller for Brinks, Inc. In March 1977 Feldman was transferred to the Hollywood, California, office of Merrill Lynch, where he was made branch manager. At about the same time Feldman and Joyner agreed to create an investment partnership, Western Investment Company, which would benefit from Feldman's special expertise in the options market. The partnership was to be a client of Merrill Lynch and so, because of a Merrill Lynch policy prohibiting employees from having a financial interest in a customer's account, the partnership agreement did not mention Feldman's 50% interest.[1]

In the California Merrill Lynch office Feldman prepared to set up an account for Western Investment. Apparently such an account requires a client to provide Merrill Lynch either with sufficient cash, or with "guarantee letters" from a bank indicating that funds are available, to cover the possibility that options will be exercised; Feld-

man and Joyner accordingly scheduled a meeting with Joyner's banker, Harold Dillenbach, at the Harris Trust and Savings Bank (the "Bank") in Chicago. According to testimony at the trial, Dillenbach was not encouraging; the chief "hangup," as he himself testified, to the Bank's providing guarantee letters in the amount of $50,000 to $100,000 was that the Feldman-Joyner plan would not allow them to secure the letters with collateral registered in their own names, since that would have disclosed Feldman's role in the partnership. Feldman returned to California without the guarantee letters from the Bank. A few days later Dillenbach told Joyner that the Bank had denied their request.

So far there is general agreement, but at this point the stories of Joyner and Feldman diverge. Joyner claimed at trial that Feldman telephoned him and told him he would send him a blank letter of credit which he could xerox after altering it with a Harris Bank letterhead. On this counterfeit form, according to Joyner's story, he was to prepare a guarantee letter which would falsely indicate that Harris Bank had $1,000,000 on deposit to cover any trades made in the name of the partnership. Joyner did his part: he prepared the fake guarantee letter and sent it on to Feldman. This first letter was followed by others, since each options transaction had to be covered by a separate guarantee letter. The letters were signed, "Albert Cooke."

Feldman's story is different. He claimed, and he claims now, that he was unaware of the fraud. He denies having sent the blank form to Joyner, and he denies having discussed with Joyner the idea of producing the counterfeit letters of credit. He points to evidence that he actually undertook to meet the "Albert Cooke" who signed the guarantee letters in January, 1978, but that he found out through

---

**1.** The original partnership agreement, in which the company was named "Augusta, Inc." after Feldman's wife Augusta, gave a 50% interest to Feldman's wife. This agreement was replaced in July 1977 by the agreement suppressing the Feldmans' share. In the later agreement the name of the partnership was changed to Western Investment Company.

Joyner that Cooke could not make the planned meeting.[2]

By either account, the arrangement began to come apart in February, 1978. Joyner had eventually arranged for Kay's Answering Service at 171 Monroe Street in Chicago (not far from the Harris Bank) to receive mail and calls for Albert Cooke under the name "HTS-Options," a name chosen to suggest the appropriate connection with the Harris Bank. Mail and calls were all forwarded to Joyner. The guarantee letters, which Merrill Lynch's assistant operations manager in Hollywood testified he received directly from Feldman and returned directly to Feldman, were to be sent to this Chicago address when they expired.

In February, several of these letters were returned as undeliverable. Feldman told his secretary to add a room number and to mail them out again, and these letters were then apparently addressed to "Harris Trust & Savings Bank" rather than to HTS-Options. As we shall see, the defense rests one of its contentions on the possibility that the *returned* letters were also addressed to Harris Trust & Savings Bank. In any event, the newly addressed letters were misdelivered to the real Harris Bank, and the scheme was exposed.

Joyner and Feldman were indicted. Joyner agreed to plead guilty to two counts and to cooperate in the government's case against Feldman, and the government dropped the remaining counts against Joyner. Feldman did not present any evidence at his trial, but argued that the government had not proved beyond a reasonable doubt that the guarantee letters were forgeries. He was convicted and sentenced to an eighteen month jail sentence.

In November, 1983, Feldman entered, in the district court, a motion for a new trial based on newly discovered evidence. That motion was denied, and apparently the denial was not appealed. In March, 1984, Feldman again moved for a new trial based on newly discovered evidence. It is from the denial of that motion that Feldman now appeals.

## II.

The purportedly new evidence consists of the expected testimony of Dianne Warner, Feldman's secretary at Merrill Lynch, and of post-trial statements, oral and written, made by Joyner to Feldman and Feldman's attorneys.

### A. Dianne Warner's Civil Deposition.

Ten months after Feldman's trial Dianne Warner gave testimony at a deposition in a related civil case. Feldman claims that this testimony establishes conclusively that Feldman had no knowledge of the phoniness of the "HTS-Option" mail drop, and that he believed the address to be a genuine Harris Bank address.

At the deposition Warner testified, from notes she had made shortly after the scheme was uncovered, that on February 21, 1978, she showed Feldman several of the guarantee letters which had been returned as undeliverable. She also testified that Feldman, after making a phone call, told her to add a room number and send them out again, and that he did not tell her to change the address in any other way. Feldman has introduced into the record, together with the transcript of the deposition, Warner's notes and xeroxes of two envelopes, all government exhibits at the time. One of the envelopes was evidently mailed to the phony drop on February 13, 1978 and it bears the address:

Mr. Albert R. Cooke
Harris Trust & Savings Bank
171 West Monroe Street
Chicago, Illinois 60603.

This address shows, of course, that letters were being sent out with the full name of the bank—instead of merely "HTS-Options"—as early as February 13. The oth-

---

**2.** The evidence consists of an entry in Joyner's diary which said that Feldman was coming to town to meet "Cooke," but that Cooke would be unavailable. The occasion for this trip was Feldman's intention, as he reported it to subordinates, to hand carry papers to Cooke instead of following the usual procedure of mailing them.

er is a similar envelope, mailed on February 21, bearing the address:

Mr. Albert R. Cooke, Vice President
Harris Trust and Savings Bank
171 West Monroe Street—Room 1161
Chicago, Illinois 60603

Warner testified that this was a new envelope typed up with the room number Feldman had told her to add.

The suggested inference from these entries is that Feldman was shown envelopes addressed explicitly to "Harris Trust and Savings Bank" and that, since Feldman did not express surprise or dismay at the envelopes bearing the full title of the bank, or instruct that it be changed to "HTS-Options," he was unaware that the drop was a phony.

## B. Joyner's Statements.

Feldman also draws our attention to certain statements made after the trial by Joyner. In an affidavit dated March 7, 1984, one of Feldman's attorneys swears that Joyner told her in conversation on March 1, 1984, that he was willing to do whatever he could to help Feldman, provided he did not risk a perjury conviction. The affidavit continues:

At the same time, he reiterated his opinion that Feldman did know that the letters were forged, and described as one particular basis for that opinion the conversations he still claims to have had with Feldman concerning establishing and testing the answering service as a mail drop for the non-existent bank officer Cooke. As for other conversations which he had with Feldman concerning the guarantee letters, he stated that he had never in so many words expressly discussed with Feldman the fact that the guarantee letters were forged, nor had he ever expressly referred to a variety of particular details concerning the forgery. He said that perhaps an argument could be made that he, Joyner, had misunderstood Feldman's comments in the conversations they had had, and that while he did not believe he had so misunderstood Feldman, he was willing to provide us

with statements from which those arguments could be made.

The affidavit continues in a similar vein. On March 2, 1984, Feldman's attorneys handed Joyner a statement to sign, containing some of the things they had discussed. Joyner eventually refused to sign on the advice of his attorney, but the statement is nevertheless now offered as new evidence by Feldman. Also offered is a second unsigned copy of the same statement containing some corrections claimed by Feldman to have been made by Joyner: for example, the words "At no time" were struck out and replaced with "I do not now recall having ever."

There is also a handwritten note signed with Joyner's name which is said by Feldman to have been given to him personally by Joyner. The note is dated February 15, 1984, and says:

To Whom It May Concern:

Upon reflection on the events leading up to my opening of an option account with Merrill Lynch under the name of Western Investment Company and the subsequent forging of Mr. Cooke's name on the bank guarantee letters, many of the events are unclear. The basic ideas concerning the opening and maintenance of the account certainly came from David Feldman. It is possible that I interpreted his comments in a way he did not intend and that he believed that Albert Cooke was a real person employed by Harris Bank. All testimony I gave at the trial was to the best of my belief true at that time. My mental disorientation and trauma present when I was fired from Brinks, coupled with the nightmare of the FBI investigation, may have affected my later interpretation of events which had taken place many years ago. Mr. Feldman's actions during the entire episode were consistent with that of a man who believed the guarantee letters to be genuine.

These statements are described in appellant's brief as "completely undermining his trial testimony that Feldman" knew of the forgeries. Appellants Brief at 18.

### III.

Our job is to determine whether the trial court has abused its discretion in refusing to grant a new trial. *United States v. Williams,* 737 F.2d 594, 617 (7th Cir. 1984); *United States v. Oliver,* 683 F.2d 224, 228 (7th Cir.1982). To obtain a new trial based on newly discovered evidence the defendant must show that the evidence "(1) came to his or her knowledge only after trial; (2) could not have been discovered sooner had defendant exercised due diligence; (3) is material, and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of a trial." *United States v. Cherek,* 734 F.2d 1248, 1253 (7th Cir.1984).

### A.  Dianne Warner's Civil Deposition.

We shall begin by assuming that Dianne Warner would testify at a new trial as she testified at her deposition, and that her testimony at the deposition clearly and unambiguously implies that Feldman was shown an envelope on which the name of the Harris Bank was spelled out in full, and that he did not react negatively to that or order her to use the abbreviation.

The first question we must answer is what it is about Warner's testimony that is supposed to constitute newly discovered evidence. If the various requirements for new evidence are not to overlap, we must construe the requirement that the evidence be newly discovered liberally, requiring only that the evidence be something that in fact came to the attention of the defendant after trial, whether or not he *should* have known of it earlier. We are willing to grant that in this case something demonstrated by Warner's deposition testimony came to the attention of Feldman and his lawyers only after the trial.

Warner had been called by the government as a witness at the trial, and she had testified to what had gone on when the guarantee letters began to be returned as wrongly addressed. The government introduced into evidence notes she had made to herself about what had gone on; she made these notes shortly after it became clear that there was something wrong and that the FBI would be involved. Feldman's counsel declined to cross-examine Warner at trial. These counsel now claim they were unaware that Warner could testify that Feldman had seen the Bank's name spelled out, and that they decided as a tactical matter, since they could not know in advance how she would testify, not to cross-examine her. They say that only after comparing the notes she had written to herself with the testimony she gave at the later deposition did the full extent of what she could testify to dawn on them. Although what the defendant saw on the envelopes can hardly be characterized as evidence that came to Feldman's attention only after trial (because he is the one who saw them originally), we are willing to concede that it came to his attention only after trial that Warner *remembered* how the letter she showed Feldman had been addressed.

The second question is whether that fact could have been discovered at trial with reasonable diligence, and this is one of the places at which Feldman's argument encounters difficulty.

We have read the trial transcript and the transcript of the later deposition with some care, and it does not appear that the "new evidence" came out of nowhere, to the surprise of defendant's counsel. Instead, it appears that, having reviewed the witness's trial testimony and the notes that she wrote to herself, counsel may have decided that if the right questions were put she would give answers that would show that Feldman must have seen the envelope with the Bank's name spelled out. At the deposition these questions were asked, and, although the answers seem to us somewhat ambiguous, counsel argue now that the answers to those questions demonstrate something that warrants a new trial. It is difficult to see why these same questions could not have been asked at trial. Warner's notes were available to Feldman's counsel, and of course they heard her testify. They could have pursued exactly the same line of questioning at trial that they

pursued later at the deposition. The question is really whether defense counsel should get another chance to pursue a line it did not pursue at trial, in spite of having the same basic information available to it at trial. We think the answer should be no.

A third question is whether the evidence—that Ms. Warner believes that Feldman saw the full name and did not react badly—is material, and not merely cumulative and impeaching.

One might not have supposed this evidence to be highly material had the government not gotten into evidence at the trial the fact that on an earlier occasion, when Bob Pereida, another Merrill Lynch employee, showed Feldman an address plate for the Western Investment account on which the name of the Bank was spelled out in full (instead of being abbreviated as "HTS-Options"), Feldman uncharacteristically lost his temper and demanded that the name be abbreviated as specified in his instructions. That fact was underlined by the government as evidence that Feldman knew of the phony mail drop and was concerned that mail concerning the Western Investment account might in fact reach the real Harris Bank. Given that line of argument, it seems to us that what defense counsel hopes to be able to show with Warner's testimony is indeed material; for if the government is right about surprise indicating guilty knowledge, it is also true that a lack of surprise is indicative of a lack of such knowledge.

Finally we must ask ourselves whether the new evidence would probably lead to an acquittal in the event of a new trial. At closing argument, the government had this to say about Diane Warner's testimony at trial:

The evidence in this case establishes beyond a reasonable doubt that David Feldman knew those letters were phony; that he went out of his way to make sure it was [not] discovered, and it was only because Diane Warner—and she testified he never told her to write out "Harris Bank," she did not tell him she was going to do it—she did it as a conscientious secretary, and the post office delivered that letter; but you can be sure that if David Feldman had known it, he would have become as enraged as he did when Bob Pereida wrote out the name on the stencil; and that, ladies and gentlemen, is consistent only with guilt.

The government makes two points here: that Feldman became angry when he saw that Pereida had spelled the name out; and that he *would have* become angry had he seen that Diane Warner spelled the name of the bank out. The proposition that we are assuming the new evidence to show— that Feldman saw the name spelled out and did not become angry—directly contradicts the second of the two points the government made in that part of its closing argument. No doubt closing argument would have been different had Warner said what the defense now expects her to say at trial, and no doubt the defense would have made a great deal in closing argument of the fact that Feldman had not become angry.

Nevertheless, the evidence against Feldman was impressive, and it is implausible to suppose that this new bit of evidence would have made a difference to the outcome of the trial. Feldman presented no evidence of his own at trial. He called no witnesses and cross-examined only some of the witnesses the government produced. He depended entirely upon a failure by the government to prove his guilt beyond a reasonable doubt. But with the evidence the government produced, it would be impossible to find that the jury verdict was insupportable; and a guilty verdict based on the same evidence, with the addition of what we are supposing Warner would say, would also be impossible to overturn as insupportable.

Much of what the government established it established without the aid of witnesses. The parties stipulated that there had been mail fraud. The government established that Feldman had been a partner in the investment firm; all income went into the partnership account, and then was disbursed in equal amounts to Joyner and

to Feldman. When options were exercised, so that the partners were forced to buy stock, they paid for it equally, each contributing the same amount to the partnership account, on which a check was then drawn for Merrill Lynch. The government produced the original forged guarantee letter, saying that the Harris Bank had "on deposit for the account of Western Investment Company" $1 million, as well as the later letters guaranteeing specific amounts.

The officer of the bank with whom Joyner and Feldman had discussed the possibility of the Harris Bank providing guarantee letters testified that Joyner and Feldman were asking for something in the neighborhood of $50,000 to $100,000. Because Feldman's part in the partnership was not to be made public, the officer said, certain securities Joyner and Feldman wanted to use as collateral could not be registered in Feldman's name, and the Bank was not willing to take collateral that could not be easily converted into cash. Either Joyner was not willing to put up all of the collateral (the evidence is that he was in poor financial condition at the time), or he could not. The Bank officer testified that he discouraged the idea that the Bank would take the collateral and provide the letters.

Several days later Feldman received in the mail a guarantee letter saying that the partnership had on deposit with the bank one million dollars. The claim that Feldman took this in his stride, and was not uncomfortable with the supposition that his own partnership was suddenly able either to deposit one million dollars with Harris Bank or to come up with one million dollars worth of collateral, though nothing of the sort ever showed up in partnership records, makes one wonder.

The government also brought to the witness stand others who worked at Merrill Lynch with Feldman. They testified to the unusual procedures Feldman established for Western Investment. Pereida testified that he had suggested to Feldman that the client (Western Investment) would be better off keeping the million dollars in trea-sury bills, but Feldman shrugged that off, saying that the client was getting better interest at the bank. All of the dealings with the Harris Bank went through Feldman, a rather unusual procedure; no one at the firm was ever allowed to contact the Bank directly.

All of this leads us to the conclusion that the evidence Warner is assumed to be able to testify to would be unlikely to change the outcome. In addition, we should make clear that that conclusion is premised on, among other things, the supposition that Warner would testify as expected, and that her testimony does in fact show what Feldman argues that it shows. In fact it is difficult to draw any clear conclusion from Warner's deposition, in spite of the fact that counsel for Feldman questioned her at the deposition with the obvious purpose of getting her to say that Feldman must have seen the name spelled out; in particular, it is impossible to conclude that Feldman had seen any particular envelope that the government entered into evidence. All that is clear from her testimony is what is clear from the envelopes themselves: that at the time she showed Feldman envelopes that had been returned, at least some envelopes had been mailed out with the Bank's name spelled out in full. Our conclusion, therefore, is that it is uncertain that Warner's testimony would show what Feldman says it would show; but that, even if it would, it could reasonably have been elicited at the first trial, and in any event there is no reason to suppose that it would have changed the outcome of the trial. As to Warner's testimony, therefore, we hold that it is not sufficient to warrant a new trial.

**B. Joyner's Statements.**

■ The "evidence" of the Joyner statements is even less persuasive. Assuming that the statements—including the unsigned statements written by Feldman's attorneys—would be admitted into evidence at a new trial, and assuming, for the sake of argument, that the evidence involved is newly discovered, it is, as far as we can

tell, consistent with what Joyner said in his testimony at trial, and there is no reason why it could not have been elicited by questioning at trial.

Feldman's attorney attests, for example, to the fact that Joyner admits that he had never "in so many words" discussed with Feldman the fact that the letters were forged, and had not discussed many of the details of the forgery with Feldman. We take Joyner, in his attempt to provide some basis for Feldman's argument of innocence, to be saying something of this sort: there was never any conversation in which I said to Feldman, or he said to me, "By the way, these letters are forged." We are perfectly willing to assume the truth of that, and we are sure that Joyner never discussed many of the details of the forgery with Feldman. But none of that is inconsistent with the supposition that the two were involved together in the forgery. The remarks in the statement Joyner is alleged to have given to Feldman support a similar construction; Joyner was willing to say whatever he could that was true that would help Feldman. He reiterated that his trial testimony was true, to the best of his knowledge. At the trial he testified that Feldman knew the letters were forged. Now he adds that Feldman's *actions* were consistent with innocence, which suggests that his guilt does not follow logically from his actions alone. But guilt seldom follows logically from actions alone; the *behavior* of any criminal is frequently consistent with innocence. For one thing, one element of most crimes is a mental state. Thus to say that Feldman's behavior was consistent with innocence is not the same as saying that Feldman was innocent. In fact the statement seems to be the same sort of guarded, non-committal statement Joyner makes elsewhere, and we are reluctant to read into it the sort of significance that Feldman would have us find in it. Further, as the trial judge pointed out at the hearing on the second motion for a new trial, the statement that the actions were consistent with innocence is a conclusion that the witness would not be permitted to draw at trial. It is not clear to us that

Feldman would not have been able to elicit these same responses at the first trial; for nothing Joyner says in any of these statements is inconsistent with anything he said at trial.

For the same reason, the "evidence" seems to us not even impeaching; Joyner reasserts throughout that what he said at trial he believed to be true, and nothing he says now is inconsistent with what he said at trial. Most importantly, nowhere in any of these statements, even in the statements written by Feldman's lawyers, does Joyner say that Feldman did not know that the letters were forged.

Finally, even if the statements impeached Joyner's trial testimony, we believe that a jury could reasonably find that the government had established Feldman's guilt beyond a reasonable doubt, even in the absence of Joyner's testimony. Feldman's part in the partnership was clearly established, and the testimony of others made it unreasonable to suppose that he did not know that the guarantee letters, which he fraudulently represented as coming from a firm in which he had no interest, and which were channeled to Merrill Lynch through him, were forgeries.

But in any event Joyner does not anywhere recant his testimony, which the jury evidently believed, and we see no reason to suppose that the introduction into evidence of such of these statements as might be admissible at a new trial would do anything to change the outcome.

### IV.

All things considered, then, the trial court did not abuse its discretion in deciding not to grant a new trial.

The denial of the motion for a new trial is affirmed.