UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert L. TUCKER, Deborah Bell, and Michael Ball, Defendants-Appellants.

Nos. 83–1438, 83–1439 and 83–1444.

United States Court of Appeals,
Seventh Circuit.

Argued May 25, 1985.

Decided Sept. 6, 1985.

Rehearing and Rehearing En Banc Denied in No. 83–1439
Oct. 10, 1985.

Rehearing and Rehearing En Banc Denied in No. 83–1438
Dec. 5, 1985.

---

Daniel C. Murray, Asst. U.S. Atty., Chicago, Ill. (Dan K. Webb, U.S. Atty., Chicago, Ill.), for plaintiff-appellee.

Aviva Meridian Kaiser, Chicago, Kent College of Law, Matthias A. Lydon, John A. Dienner, III, Pierce, Lydon, Griffin & Montana, John C. Tucker, Jenner & Block, Chicago, Ill., for defendants-appellants.

Before POSNER and COFFEY, Circuit Judges, and CAMPBELL, Senior District Judge.*

POSNER, Circuit Judge.

Michael Ball, Deborah Bell, and Robert Tucker were tried together for wire fraud (see 18 U.S.C. § 1343) and for submitting false statements to a federally insured bank (18 U.S.C. § 1014); were convicted by a jury; and were sentenced to prison terms of 9 months (Ball), 15 months (Tucker), and 2 years (Bell), plus periods of probation and, in the case of Bell and Tucker, were also ordered to make restitution of $5 million, subject to certain conditions. All three defendants appeal, raising a variety of questions.

The scheme charged by the government worked as follows. Bell, a commodities broker in Chicago, with the aid of Ball, a freight forwarder in Miami, and Tucker, who was Bell's lawyer, made a contract to sell 6,000 tons of beans to Guatemala for $5 million. Bell did not have the beans, of course; she was a middleman; to get the beans she turned to Irving Pheterson, a commodities broker in Miami who had a supplier in the Far East. The contract with Guatemala was to be paid for by a letter of credit issued by a Guatemalan bank and confirmed by the Continental Illinois National Bank in Chicago. Under the terms of the letter of credit, the Continental Bank would pay Bell for the beans upon receipt of documents showing that they had been loaded on board ship in Hong Kong en route to Guatemala, and Bell would then reimburse Pheterson. So the beans would go from Hong Kong to Guatemala, while payment would go from the Continental Bank to Bell to Pheterson. The letter of credit made the Continental Bank in effect the payment agent of the Guatemalan buyer.

Documents showing that the beans had been loaded were presented to the bank, and the bank paid the letter of credit. But the documents had been forged; the beans had not been (and never were) shipped. Pheterson testified under a grant of immunity that the three defendants had forged the documents. There is no question the documents were forged; the question is by whom. The defendants argue that Pheterson was the real architect of the fraud and testified against them to save his own skin. The government's theory was different: that since the letter of credit had not been made transferable, the defendants could not assign it to someone as collateral for a loan that would enable them to buy the beans needed to fulfill the contract, see generally White & Summers, Handbook of the Law Under the Uniform Commercial Code 747–51 (2d ed. 1980), and had turned to forgery to get the money they needed to buy the beans.

* Hon. William J. Campbell of the Northern District of Illinois, sitting by designation.

■ The substantive issue in this appeal, an issue apparently of first impression, is whether a letter of credit is within the scope of 18 U.S.C. § 1014, which punishes false statements made to influence a bank's action "upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan." The false statements in this case were made to induce the Continental Bank to deposit $5 million in the defendants' account. The transaction fits comfortably within the statutory terms "application," "advance," and "commitment." The bank was obligated to pay Bell upon presentation of the required documents. This was a commitment; and the forged documents were in support of an "application" designed to induce the bank to honor its "commitment" and "advance" funds to the applicants.

*Williams v. United States,* 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), on which the defendants rely, is inapposite. The Court held that check-kiting does not violate section 1014, because merely depositing a check that is not backed by funds is not a false statement. See *id.* at 284–85, 102 S.Ct. at 3091–92. The defendants in this case made explicit representations which were false in order to get Continental Bank to part with $5 million. Although we can find no cases under section 1014 involving letters of credit, our conclusion that a fraudulent representation made to induce the bank to pay the beneficiary violates the section is supported by analogy to several cases decided after *Williams*: *United States v. Price,* 763 F.2d 640, 643 (4th Cir.1985); *United States v. Davis,* 730 F.2d 669, 673 (11th Cir.1984); *United States v. Shaid,* 730 F.2d 225, 232 (5th Cir.1984); *Prushinowski v. United States,* 562 F.Supp. 151, 156–58 (S.D.N.Y.1983).

■ We next consider the sufficiency of the evidence to convict. Pheterson was, as the judge remarked, an unreliable witness, not only because he had an incentive to shift the responsibility for the fraud to the defendants but because his testimony contained contradictions and memory lapses,

and, more seriously, because there is evidence that he is mentally impaired (more on this shortly). Nevertheless there is no serious question about the guilt of Bell and Ball, at least. Fingerprint and handwriting evidence, statements to third parties, testimony from bean suppliers, and the testimony of Tucker's secretary corroborate Pheterson's testimony against them.

■ Although there is more question about Tucker's guilt, we are persuaded that a reasonable jury could find sufficient corroboration of Pheterson's testimony to convict Tucker, even if the jury maintained as it should have done a healthy skepticism about Pheterson's honesty and recollection. Among the documents submitted to the bank on September 5, 1980, to get the letter of credit paid was one that certified that the beans were on board ship in Hong Kong. But shortly afterward Tucker got approval for a letter of credit to pay for beans to fulfill the contract. This shows that Tucker knew the document was false, albeit after the document had been submitted to the bank. Some of his secretary's testimony indicated that Tucker was present when questionable documents were being prepared (for example, a phony bill of lading for the beans purportedly shipped from Hong Kong), and she testified to statements made by him that were consistent with guilty knowledge. And Tucker wrote checks to himself for a total of $68,000 from an account in which the letter of credit had been deposited. These payments ostensibly were to repay a loan he had made to facilitate the transaction, but even so this suggests that his role was entrepreneurial, and not just that of a lawyer (his theory). Although apart from Pheterson's testimony the evidence fell far short of proving Tucker's participation in the fraud beyond a reasonable doubt—most of it being consistent with his playing just a lawyer's role—the significance of the other evidence is that it corroborates Pheterson's testimony. Ordinarily a jury can convict on the basis of a single eyewitness's testimony, but we may assume that where the witness was as unreliable as Pheterson

there would have to be some corroboration. There was.

■ We turn now to the alleged procedural errors at the trial. The district judge refused to order a psychiatric examination of Pheterson or conduct a hearing on his competence to testify, and the defendants argue that this was error because Pheterson (they argue) obviously had serious mental problems. For reasons discussed in *United States v. Gutman*, 725 F.2d 417, 420 (7th Cir.1984), and unnecessary to repeat here, we hesitate to reverse a district judge's refusal to order that a witness submit to a psychiatric examination; and there was no abuse of discretion by the judge in this case. The defendants make much—too much—of the fact that in 1978, two years before the event in issue, Pheterson had brought a personal-injury suit, later dismissed, in which he claimed to have suffered brain damage as a result of being exposed to dry-ice fumes (i.e., carbon dioxide); of his subsequent statements that the carbon-dioxide poisoning had caused an impairment of his memory; and of a letter that Pheterson wrote to an assistant United States attorney in which he discussed the conflict between his "oversoul" and his "undersoul." In fact there is no indication that Pheterson had suffered significant brain damage caused by dry-ice fumes or anything else (he was conducting business as usual two years after bringing that suit), or that he had any mental illness, though he admitted that he had a problem remembering things—a type of problem too common, however, to be suggestive of a mental disease or defect that psychiatry might elucidate. The letter in question is rambling, weird, but not demented. The reference to a conflict between the "oversoul" and the "undersoul"—between what Freudian psychologists call the superego and the id, and what laymen a generation ago called one's "good angel" and one's "bad angel"—is not evidence of mental illness. The letter was a rough draft that Pheterson was reluctant to turn over to the assistant United States attorney; and many rough drafts, like the unedited thoughts that run through people's minds,

are pretty strange. Although the defendants' psychiatric expert said that Pheterson's brain injuries and statements were consistent with "Organic Amnestic Syndrome," "one of the major symptoms of [which] is confabulation, the recitation of imaginary events to fill in gaps in memory," many minor symptoms are "consistent" with major diseases; a cough is consistent with lung cancer. All the record of this case shows is a troubled and evasive witness desperate for immunity and selective and self-justifying in his recollections. It does not show a man who is demented, and the judge was not required to force him to submit to an examination by a psychiatrist. Cf. *United States v. Eschweiler*, 745 F.2d 435, 438 (7th Cir.1984). The witness in *Gutman*, in contrast, had a long history of serious mental illness.

■ The letter we have just mentioned is a main prop of the defendants' claim that the government pressured Pheterson to tell the government's version of the events constituting the fraud, regardless of what he actually believed, by dangling immunity bait; for the letter ends: "Every time I start to writing I feel that I am not 'saying it right' so I tear it up and start over. I hope this is what you need. Please advise. Thank you." But Pheterson had given the outline of his story in connection with a civil suit before being subpoenaed by the grand jury; the letter from which we have quoted is consistent with Pheterson's simply having found it difficult to set forth the entire complicated story in a coherent form; and the assistant United States attorney to whom the letter was addressed repeatedly adjured Pheterson to tell the truth.

■ Tucker also objects to the judge's refusing to let him introduce the letter into evidence as an exhibit. The letter was incorrectly excluded as hearsay. It would have been hearsay if offered to show the truth of what it contained, but it was not hearsay when offered to undermine the writer's credibility as a witness. Though we ourselves are not troubled by the discussion in the letter of the war between

Pheterson's "oversoul" and "undersoul," the jury was entitled to consider the letter as evidence that, as the defendants argued, Pheterson was an unreliable witness. But the error in excluding the letter from the documentary evidence in the case was harmless. The defendants used the letter to cross-examine Pheterson, so that much of it was read to the jury. It was used, of course, to undermine Pheterson's credibility, which is the only purpose for which Tucker wanted the letter used. We cannot imagine that the jury would have reached a different result by having the letter to re-read in the jury room with the extensive other documents in the case.

■ Tucker objects to the district court's refusal to admit the results of a lie-detector test which he had taken and passed. In this circuit the admissibility of lie-detector test results has thus far been left to the discretion of the trial judge. *United States v. Williams*, 737 F.2d 594, 611 (7th Cir.1984). Perhaps some day we will have to lay down circuit-wide policy on the question but this is not the case in which to do so. Tucker refused to agree before he took the lie-detector test that the results, whatever they were, could be used in evidence. Such a refusal could well make lie-detector test results unreliable. See *United States v. Feldman*, 711 F.2d 758, 767 (7th Cir.1983); but see Raskin, Barland & Podlesny, *Validity and Reliability of Detection of Deception* 6, 21–22, 24–25 (Natl. Inst. of Law Enforcement and Crim.Justice, June 1978). The lie detector does not peer into the mind; it is a test of (relative) anxiety, and if the person taking the test has nothing to lose and everything to gain, he may not be anxious and his passing the test may prove nothing. Whatever the force of this doubt, it is readily allayed by agreeing to allow the government to put the test results, whatever they may be, into evidence if it wants; and a defendant who refuses to make such an agreement is in a poor position to challenge the district court's exercise of its discretion to refuse to admit the results.

■ Tucker also complains about the district judge's refusal to let him address the jury in closing argument. Tucker is a lawyer and could if he had wanted have represented himself (of course he could have done so even if he were not a lawyer), but in fact he had three lawyers at trial and his own participation as counsel was minimal. The judge was concerned that since the jury had seen Tucker as a defendant, not as a defense lawyer, it would be confused if he addressed it in closing argument; the jury would think it was being addressed by a defendant, not by a lawyer. Tucker had declined to testify, thus sparing himself cross-examination. To allow him to address the jury would in effect have allowed him to testify without being subject to cross-examination. This is the same "heads I win, tails you lose" tactic that Tucker attempted with the lie-detector test. The judge did not abuse his discretion by not allowing Tucker to address the jury.

■ Next the defendants complain about certain documents that the government submitted to the district judge *in camera*. The documents consisted of reports from a confidential government informant on other misdeeds of the defendants, and the purpose of the submission—the ostensible purpose anyway—was to make sure the government was not required to give any of this information to the defendants. The judge ruled that it was not exculpatory, and the defendants argue that the real purpose was to poison the judge's mind against them. But we think the government acted prudently, since if it had not submitted the documents for the judge's inspection it might have opened itself up to a later attack for violating the defendants' rights under the doctrine of *Brady v. Maryland*, 373 U.S. 83, 87–88, 83 S.Ct. 1194, 1196–97 10 L.Ed.2d 215 (1963), and *United States v. Agurs*, 427 U.S. 97, 112–13, 96 S.Ct. 2392, 2401–02, 49 L.Ed.2d 342 (1976). As for poisoning the judge's mind, that is a ridiculous suggestion. Anytime a judge grants a motion to suppress evidence against the defendant, it means the judge is in possession of damaging evidence that the jury will not see; and yet

we do not on that account require that the trial be conducted before another judge, who is innocent of this evidence. We trust our judges to preside impartially over trials in which they know much that the jury does not know adverse to the defendants; there is no indication that the district judge failed to do his duty in this case.

■ The defendants also argue that the prosecutor improperly used four of his seven peremptory challenges to exclude all four black veniremen from the jury, with the result that the jury was all white. Whether the exercise of peremptory challenges on racial grounds violates a criminal defendant's rights when there is no suggestion that the prosecutor's office follows a policy of racial exclusion (that is, uses racially motivated peremptory challenges systematically, and not just occasionally) is an issue now before the Supreme Court. See *Batson v. Kentucky,* —— U.S. ——, 105 S.Ct. 2111, 85 L.Ed.2d 476 (cert. granted 1985). However it is resolved, these defendants are unlikely to be helped. For the judge in this case, though not required to do so, asked the prosecutor to explain the basis of the four challenges of blacks, and the judge believed the prosecutor's explanation that the motive was not racial. The prosecutor wanted an educated jury that could understand letters of credit and the other aspects of this complicated commercial transaction, and the four blacks happened to have very little education or commercial experience. The judge did what courts that consider racial peremptory challenges unlawful require the trial judge in these cases to do; he satisfied himself that racial bias had not been responsible for the exclusion of the blacks. See, e.g., *McCray v. Abrams,* 750 F.2d 1113, 1131–33 (2d Cir. 1984). His determination, although challenged by the defendants, was not clearly erroneous, and therefore binds us.

The other grounds for reversal advanced by the defendants have no possible merit.

AFFIRMED.