UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert L. TUCKER and Deborah Bell,
Defendants-Appellants.

Nos. 87-1049, 87-1050 and 87-1324.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 18, 1987.

Decided Jan. 6, 1988.

Rehearing and Rehearing En Banc Denied in No. 87-1049 Jan. 26, 1988.

Rehearing Denied in Nos. 87-1049 and 87-1050 Feb. 29, 1988.

Rehearing and Rehearing En Banc Denied in No. 87-1324 March 1, 1988.

William J. Harte, William J. Harte, Ltd., Chicago, Ill., Michael T. Pate, Louisville, Ky., for defendants-appellants.

Daniel C. Murray, Asst. U.S. Atty., Anton Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before BAUER, Chief Judge, CUMMINGS, and POSNER, Circuit Judges.

BAUER, Chief Judge.

A jury convicted Deborah Bell, Robert Tucker, and Michael Ball on charges of wire fraud, 18 U.S.C. § 1343, and submitting false statements to a federally insured bank, 18 U.S.C. § 1014. All were sentenced to prison terms plus periods of probation and ordered to make restitution, subject to certain conditions. In an earlier opinion, we affirmed the convictions. *United States v. Tucker*, 773 F.2d 136 (7th Cir.1985), *cert. denied*, — U.S. —, 106 S.Ct. 3337, 92 L.Ed.2d 742 (*Bell*), and — U.S. —, 106 S.Ct. 3338–39, 92 L.Ed.2d 742 (*Tucker*) (1986).

Shortly before they were to surrender to their designated institutions on September 9, 1986, Bell and Tucker each filed motions pursuant to Federal Rule of Criminal Procedure 35 for a new trial based upon newly discovered evidence, and motions to stay their surrender dates. The newly discovered evidence is the putative testimony of Ball, the essentials of which are contained in an August 27, 1986 affidavit accompanying the motions for a new trial. In addition, on January 27, 1987, Tucker filed a motion pursuant to 28 U.S.C. § 2255 to vacate and set aside his judgment of conviction and sentence, alleging constitutional deprivations in the petit jury selection process. The district court denied Bell's and Tucker's motions and both now appeal.

## I.

Bell, a commodities broker in Chicago, and Tucker, her lawyer, contracted to sell 6,000 tons of beans to Guatemala for $5 million. Ball, a Miami freight forwarder, helped set up the deal. To get the beans, Bell contacted Irving Pheterson, a Miami commodities broker with a Far Eastern bean supplier. The contract provided that Guatemala would pay for the beans through a letter of credit issued by a Guatemalan bank and confirmed by the Continental Illinois National Bank in Chicago. Pursuant to the letter of credit, the Continental Bank would pay Bell for the beans upon receipt of documents showing that the beans had been loaded in Hong Kong

on board a ship bound for Guatemala. Bell would then reimburse Pheterson.

The defendants presented to the Continental Bank documents showing that the beans had been loaded and shipped, and the bank paid on the letter of credit. There was no boat, however, and there were no beans. The documents were forged. The question at trial: By whom? The defendants argued that Pheterson designed the fraud and testified against them to save his skin. The government charged that because the letter of credit was not transferable, the defendants could not use it as collateral for a loan and therefore turned to forgery to get money to buy the beans. The jury found the government's version of events more credible and convicted all three defendants.

## II.

Bell and Tucker both argue that the district court erred in denying them a new trial based upon the putative testimony contained in Ball's affidavit. That affidavit, in a nutshell, states that Ball and Pheterson prepared the false documents the defendants presented to the Continental Bank, and that neither Ball nor Pheterson told the defendants the documents were false before the bank paid on the letter of credit. Bell and Tucker argue that Ball's affidavit destroys Pheterson's trial testimony and vindicates their own version of events—that they had no knowledge of Pheterson's and Ball's fraudulent scheme.

Initially, we note that

[t]he party who claims that the trial court erred in denying his motion for a new trial is not likely to be successful. The appellate court properly defers to the view of the trial court and will affirm unless there has been error as a matter of law or a clear and manifest abuse of judicial discretion.

*United States v. Davis,* 604 F.2d 474, 483 (7th Cir.1979) (citation omitted). This is because a motion for a new trial based upon newly discovered evidence that exists only because a convicted defendant comes forward with an affidavit in which he states that he is prepared to exculpate his codefendants is inherently suspect. *United States v. Simmons,* 714 F.2d 29, 31 (5th Cir.1983). Such motions are not favored by the courts and are viewed with great caution. *United States v. Goodwin,* 770 F.2d 631, 639 (7th Cir.1985) (citation omitted), *cert. denied,* 474 U.S. 1084, 106 S.Ct. 858, 88 L.Ed.2d 897 (1986).

To obtain a new trial based upon newly discovered evidence, a defendant must show that the evidence " '(1) came to his or her knowledge only after trial; (2) could not have been discovered sooner had the defendant exercised due diligence; (3) is material, and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of a trial.' " *United States v. Feldman,* 756 F.2d 556, 560 (7th Cir.1985) (quoting *United States v. Cherek,* 734 F.2d 1248 (7th Cir.1984)).

The district court held that the putative testimony of Ball failed to satisfy the third and fourth prongs of the *Feldman* standard. The court found that Ball could not testify to some of the matters asserted in his affidavit under the Federal Rules of Evidence, that other assertions contained in it are consistent with the government's evidence, and that substantial evidence contradicts much of what Ball asserts that is inconsistent with the government's evidence. The court thus held that "[Ball's] proffered testimony is not new as to subject matter, but is a different version of what the jury heard. As such, and given its source, the evidence is merely impeaching or cumulative and is not material." The district court also found Ball's affidavit incredible. The court noted that Ball had "sat on his hands for close to four years" before coming forward with the new information, and that Ball had managed to accumulate another federal conviction for forging false documents in a sugar-for-export scheme between his felony conviction in this case and the date of his affidavit. The court concluded that "[c]onsidering the evidence against Ball himself and the fact that the jury convicted him on all counts, it cannot be said his testimony would probably lead to an acquittal in the event of retrial."

After reviewing Ball's affidavit and considering the defendants' contentions, we find that the district court did not abuse its discretion by refusing to grant a new trial. A district court, when entertaining a motion for a new trial, may rely on knowledge gained while presiding over the trial, *United States v. Garrison*, 296 F.2d 461, 465 (7th Cir.1961), *cert. denied*, 369 U.S. 804, 82 S.Ct. 643, 7 L.Ed.2d 550 (1962), and when newly discovered evidence is suspect, it may assume the role of factfinder, *United States v. Carlin*, 573 F.Supp. 44, 46 (N.D.Ga.1983) *affirmed*, 734 F.2d 1480 (11th Cir.1984). Moreover, although Pheterson's testimony was important to the government's case against Bell and, especially, Tucker, *see Tucker*, 773 F.2d at 139, the government did not ground its prosecution entirely on Pheterson's story. Other corroborating evidence contributed to the defendants' convictions. In Bell's case, there was fingerprint and handwriting evidence, testimony from bean suppliers, and testimony from Tucker's secretary. In Tucker's case, *inter alia*, his secretary testified to his presence during the preparation of questionable documents and to statements made by him that are consistent with guilty knowledge. *Id.* This corroborating evidence, plus the district court's understandable skepticism toward Ball's putative testimony, convinces us that the court did not abuse its discretion in denying a new trial.

### III.

Tucker, who is black, also contends on appeal that the district court erred in denying his section 2255 motion to vacate and set aside his judgment of conviction and sentence. He argues that the court's finding that the prosecution did not purposefully exclude black venirepersons from the jury because of their race was clearly erroneous. He also argues that the procedure adopted by the district court to scrutinize the prosecution's motives violated his constitutional rights.

### A.

During jury selection, before any party exercised any peremptory challenges, Tucker noted that only four of the thirty-six venirepersons questioned in the jury box were black. Tucker requested that the court require the prosecution to state, in camera for the record, its reasons for excusing any of the four blacks. The court reserved decision on the request.

The prosecution then exercised four of its seven peremptory challenges to exclude all four blacks on the venire. Tucker thereafter renewed his request that the court require the prosecution to explain in camera why it excused the blacks. After the prosecution told the court that it had reasons other than race for exercising its peremptories, the court asked if it would state those reasons in camera, out of the presence of the defendants. All the defendants objected to an ex parte procedure. The court, however, overruled the defendants' objections.

After checking with its superiors, the prosecution agreed to comply with the court's request. Thus, in camera and out of the presence of the defendants, the prosecution explained that because the case involved a complicated international banking transaction between numerous parties with many complicated documents, it wanted jurors with education and business experience. After considering the government's explanation, the court "concluded and was satisfied that racial bias was not responsible for the challenge of the black venirepersons" without revealing the prosecution's stated reasons for the peremptories to the defendants.

### B.

The Constitution's equal protection clause forbids a prosecutor from purposefully exercising peremptory challenges to exclude potential jurors solely on account of their race. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 1718–19, 90 L.Ed.2d 69 (1986). In *Batson*, the Supreme Court held that a defendant may establish a prima facie case of such purposeful discrimination solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. *Id.* 106

S.Ct. at 1722–23.[1] Once the defendant establishes a prima facie case of such purposeful exclusion, the burden shifts to the prosecutor to present a neutral explanation for challenging black jurors. *Id.*[2] The Court expressly declined, however, "to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenge." *Id.* at 1724.

*Batson* thus enables a defendant to overcome the longstanding presumption announced in *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), that "in any particular case ... the prosecutor is using the state's challenges to obtain a fair and impartial jury." *Id.* at 222, 85 S.Ct. at 837. Until the Court overruled that portion of *Swain* in *Batson*, a defendant seeking to raise an equal protection challenge had to show that a prosecutor systematically used, over some period of time, peremptory challenges to exclude blacks from juries. *See id.* at 227, 85 S.Ct. at 839. Although *Swain* was still good law at the time of Tucker's trial, the Court in *Griffith v. Kentucky*, —— U.S. ——, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987), held *Batson* retroactively applicable to all cases not yet final. We must, therefore, apply *Batson*'s holding to Tucker's claim.

### C.

Tucker's most serious contention is that the district court's in camera, ex parte procedure violated his fifth amendment right to due process and his sixth amendment right to a fair and impartial jury. The parties do not dispute that Tucker made out a prima facie case of purposeful discrimination under *Batson*, and that the burden shifted to the government to artic-ulate race-neutral reasons for its peremptory challenges. What is in dispute is whether *Batson* allows a court to hear the prosecution's reasons for excusing black venirepersons in camera and out of the presence of the defendants, and then rule on the *Batson* challenge without divulging those reasons to the defendants. Tucker argues that "a secret proceeding between the prosecutor and the court" is an irrational interpretation of *Batson*, and that nothing in *Batson* or its progeny suggests that a prosecutor can rebut a defendant's prima facie case through an ex parte conversation with the judge. The government responds that *Batson* does not require an adversarial hearing before a court can rule on a *Batson* challenge and points to the Sixth Circuit's recent decision in *United States v. Davis*, 809 F.2d 1194 (6th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 3234, 97 L.Ed.2d 740 (1987), for support.

In *Davis*, during jury selection in a pre-*Batson* trial, black defendants objected when the prosecution exercised peremptory challenges to exclude seven of nine black venirepersons from the petit jury. After finding facts sufficient to establish what it determined was a prima facie case of racially motivated exclusion, the district court required the prosecution to state its reasons for the peremptories in camera and out of the presence of the defendants. *Id.* at 1200. The district court then found that the prosecution did not purposefully exclude the venirepersons on the basis of their race. *Id.* On appeal, the Sixth Circuit held that the in camera, ex parte procedure was constitutional because "the record of the proceedings ... simply [did] not indicate a situation where the presence

---

**1.** To establish such a prima facie case, a defendant

first must show that he is a member of a cognizable racial group, and that the prosecutor exercised peremptory challenges to remove from the venire members of his race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." Finally, the defendant must show ... circumstances that raise an inference that the prose-cutor used that practice to exclude the veniremen from the petit jury on account of their race.

*Batson*, 106 S.Ct. at 1723 (citations omitted).

**2.** The prosecutor may not rely on an assumption that the challenged jurors would be partial to the defendant because of their shared race; nor may the prosecutor merely deny any discriminatory motive or assert good faith. *Batson*, 106 S.Ct. at 1722–23. The prosecutor "must articulate a neutral explanation related to the particular case to be tried." *Id.*

of the defendants and their counsel was required to ensure fundamental fairness." *Id.* at 1201. The Sixth Circuit noted that the trial court had predicted with remarkable accuracy the burdens of proof and persuasion later pronounced by the Supreme Court in *Batson,* and found that the trial court's procedure was consistent with that decision because

> *Batson* does not require rebuttal of the Government's explanation by defense counsel. Nor does *Batson* require the participation of defense counsel while the Government's explanations are being proferred. This is not to say that rebuttal and participation by a defendant in the "neutral explanation" phase of a *Batson* challenge are always inappropriate. To the contrary, the Supreme Court left it up to the trial court to determine what role defendants were to play once the government proffered its reasons for black juror exclusion.

*Id.* at 1202. In short, "the district court was entitled to hear from the government under whatever circumstances the court felt appropriate." *Id.*

The Ninth Circuit disagrees. A divided panel of that court held recently that the Constitution requires adversarial hearings when defendants raise *Batson*-type challenges. *United States v. Thompson,* 827 F.2d 1254 (9th Cir.1987). In *Thompson,* the prosecution, during a pre–*Batson* trial, used peremptory challenges to exclude all four black venirepersons from the petit jury. After the defendant moved for a mistrial, the district court heard the prosecution's reasons for the disputed challenges in camera and out of the presence of the defendant, who argued that such a procedure violated his fifth and sixth amendment rights.

The Ninth Circuit, in its comprehensive treatment of the issue, first noted that

> situations where the court acts with the benefit of only one side's presentation are uneasy compromises with some overriding necessity, such as the need to act quickly or to keep sensitive information from the opposing party. Absent such compelling justification, ex parte proceedings are anathema in our system of justice and, in the context of a criminal trial, may amount to denial of due process.

*Id.* at 1258–59. The court then considered three "separate, but related" justifications for the ex parte procedure asserted by the government: (1) that once a defendant has identified a potential *Batson* violation, its participation is no longer necessary for the district court to make its determination; (2) that adversarial hearings potentially involving the questioning of government counsel would be too burdensome and disruptive; and (3) that the potential for release of confidential information could prejudice the government's ability to prosecute its case. *Id.* at 1259–61.

The Ninth Circuit found the first justification the least persuasive. According to the court, the defendant can point out to the judge when the government's stated reason may indicate bad faith, and may be able to argue that the government's reasons are legally improper. Thus, the notion that a defendant has nothing to add once he or she has identified a potential *Batson* violation "did not square with reality." *Id.* at 1260.[3] The court also rejected the second justification, stating that it "would be surprised ... if [adversarial] proceedings [would] involve anything more elaborate than the prosecutor's articulation

---

**3.** The Ninth Circuit believed that this justification "carried the day" with the Sixth Circuit in *Davis. Thompson,* 827 F.2d at 1260. We think this misreads the *Davis* opinion. The Sixth Circuit in that case found that the record of the proceedings *in the case before it* did not indicate a situation where the presence of the defendant was required to ensure fundamental fairness. See *Davis,* 809 F.2d at 1201. In addition, the Sixth Circuit amplified that it was referring only to the case before it when it explained its view of the proceeding below. It noted that the de-

fendants had been able to argue the constitutional issue when it made each of three objections to the government's peremptory challenges during the jury selection process, and that the district court gave the defendants' claim painstaking attention by constructing a procedure for determining whether there was a racial motivation for the government's actions. *Id.* Moreover, the Sixth Circuit made clear that it was not holding that rebuttal by defendants in the explanation phase of a *Batson* challenge is always inappropriate. *Id.* at 1202.

of his reasons, followed by the argument of defense counsel pointing out why the articulated reasons are factually unfounded or legally insufficient." *Id.* at 1259–60. The government's third justification, however, had some merit. "It is certainly possible," the court admitted, "that in a particular case the prosecution's motive for excluding potential jurors will grow out of its case strategy, and divulging those reasons to opposing counsel could cause it severe prejudice." *Id.* at 1259. But the court also discarded this justification, reasoning that "when a prosecutor claims that his reasons relate to case strategy, the district judge can consider those reasons on an ex parte basis, at least initially, much as in situations involving *Brady* materials or the identity of informants." *Id.*

We disagree with the Ninth Circuit's holding that *Batson* requires adversarial hearings once a defendant establishes a prima facie case of purposeful discrimination. As already noted, the Supreme Court in *Batson* expressly declined to formulate procedures for district courts to follow upon a defendant's objection to a prosecutor's challenges. *Batson,* 106 S.Ct. at 1724. The Court apparently did so because trial judges deserve and normally enjoy a wide range of discretion in the administration of trials.[4] Indeed, the Ninth Circuit in *Thompson* stressed the central importance of trial court discretion in our criminal justice system. *See Thompson,* 827 F.2d at 1257–58. And that court's allowance for in camera, ex parte hearings when the prosecution claims that it exercised peremptory challenges pursuant to its case strategy gives the trial court discretion to determine whether an adversarial hearing is required in many, if not most cases. Stated bluntly, the *Thompson* exception swallows the *Thompson* rule. As Chief Judge Sneed's dissent pointed out, the majority in *Thompson* resorted to trial court discretion "to rescue it from the most troublesome aspect of its opinion." *Id.* at 1262 (Sneed, C.J., dissenting).

 We thus agree with the Sixth Circuit that *Batson* neither requires rebuttal of the government's reasons by the defense, nor does it forbid a district court to hold an adversarial hearing. In this case, then, the district court's procedure passed constitutional muster. Indeed, we think the district court handled Tucker's challenge remarkably well. Like the district court in *Davis,* the court below accurately anticipated the burdens of proof and persuasion set forth in *Batson,* and its procedure certainly was countenanced by that decision.

Despite this conclusion, we believe that adversarial hearings are the appropriate method for handling most *Batson* -type disputes. In this case, for example, we believe that the prosecution could have explained its reasons for excluding the four black venirepersons in open court. Thus, while we hold that it is up to the trial judge to decide what procedure is best-suited for a particular case, we trust that the trial judge will utilize an adversarial procedure whenever possible.

## D.

We have already considered and decided Tucker's final assertion—that the district court erred in finding that the prosecution did not purposefully exclude blacks from the jury because of their race. In the direct appeal of the defendants' convictions, we found that the judge had "satisfied himself that racial bias had not been responsible for the exclusion of the blacks. His determination, although challenged by the defendants, was not clearly erroneous, and therefore binds us." 773 F.2d at 142. It binds us still.

The district court is therefore

AFFIRMED.

---

4. In the *Batson* Court's view, there was no reason to assume that trial judges would not identify prima facie cases of purposeful discrimination and perform conscientiously their duties under the Constitution. See *Batson,* 106 S.Ct. at 1724 n. 32.