Donna Maria **WILLIAMS**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 05–87–00632–CR.

Court of Appeals of Texas, Dallas.

March 13, 1989.

Richard Alan Anderson, Keith E. Jagmin, Dallas, for appellant.

Pamela Sullivan Berdanier, Dallas, for appellee.

BAKER, Justice.

Although Donna Maria Williams asserts six points of error in this appeal of her conviction of voluntary manslaughter, this opinion is concerned only with her fifth point. Appellant contends that the trial court erred in denying her the right to cross-examine the prosecutor about the prosecutor's explanations for exercising peremptory challenges on veniremen who were members of a racially cognizable group. We agree, abate this appeal, and remand this case to the trial court for a *Batson* [1] hearing.

At trial appellant complained that her constitutional right to equal protection of the law was violated because the State exercised its challenge to exclude a member of the venire from the jury on the basis of race. The court held a *Batson* hearing and required the prosecutor to articulate her reasons for peremptorily challenging a particular juror. Upon completion of the prosecutor's testimony, counsel for appellant requested the opportunity to inquire of the prosecutor. The court refused, stating it would not allow cross-examination of the prosecutor. Appellant complains that she was denied a fair opportunity to prove unlawful racial discrimination by the State in peremptorily challenging the prospective juror because of the trial court's refusal to allow her to cross-examine the prosecutor during the *Batson* hearing. She contends that her constitutional rights to a fair trial and effective assistance of counsel entitled her to such cross-examination. We agree that her right to a fair trial entitles her to such cross-examination.

In order to invoke the protections set forth in *Batson*, a defendant must estab-

---

1. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

lish purposeful discrimination by showing that:

    1. he was a member of a cognizable racial group;

    2. the prosecutor had exercised peremptory challenges to remove from the venire members of the defendant's race (peremptory challenges constitute a jury selection practice which permits those to discriminate who are of a mind to discriminate); and

    3. these facts and any other relevant circumstances raise an inference that the prosecutor used peremptory challenges to exclude the veniremen on account of their race.

*See Keeton v. State,* 724 S.W.2d 58, 65 (Tex.Crim.App.1987); *Batson,* 106 S.Ct. at 1723.

■ If the defendant raises an inference of purposeful discrimination through the State's use of its peremptory strikes and the trial court determines that a prima facie case of discrimination exists, then and only then does the burden shift to the State to come forward with a neutral explanation as to why peremptory strikes were exercised on the veniremen who were struck. *See Tompkins v. State,* No. 68,870, slip op. at 5, (Tex.Crim.App. Oct. 7, 1987) (not yet reported).

■ A prima facie case represents the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true. The party with the burden of proof must produce at least this much evidence to avoid a finding that the allegation is not true as a matter of law. Once produced, however, the allegation must be found true unless it is contradicted, impeached, or rebutted by other evidence. In the context of a *Batson* hearing, such other evidence must include a racially neutral explanation by the prosecuting attorney and must be legally adequate to support a judgment in favor of the State. It is still, however, the burden of the ac-

cused to persuade the trial judge by a preponderance of the evidence that the allegations of purposeful discrimination are true in fact. *See Tompkins v. State,* slip op. at 7; TEX.CODE CRIM.PROC.ANN. art. 35.261 (Vernon Supp.1988).

Thus, the issue is whether the refusal of the trial court to permit cross-examination of the prosecutor by an accused curtails or otherwise inhibits an accused's attempt to carry the ultimate burden and thereby denies an accused his right to a fair trial. We conclude that it does.

Although jeopardy does not attach until a jury is impaneled and sworn [2] the selection of a fair and impartial jury to hear the case on the merits is of such vital importance to an accused that we conclude and hold the selection process is part and parcel of the "adversarial" nature of the trial on the merits. When a *Batson* motion is timely made, the trial court should conduct the hearing in an adversarial manner.

■ An accused, when going forward with his burden of producing evidence of a prima facie case of discrimination, should have the right to adduce evidence sufficient to establish the criteria required by *Batson.* This right should include the opportunity to call witnesses, including the prosecutor as an adverse witness for direct examination,[3] in the accused's attempt to satisfy the prima facie burden imposed upon him. If the trial court concludes that the accused has established a prima facie case under *Batson* and requires the prosecutor to offer racially neutral explanations for the exercise of peremptory challenges, then an accused should not be denied the right to cross-examine the prosecutor to attempt to rebut those explanations offered by the prosecutor. Since the accused bears the ultimate burden of persuading the trial judge that the discrimination allegations are true, the denial or improper curtailment of cross-examination, in our view, denies to an accused the right to a fair trial.

---

**2.** *See Garza v. State,* 658 S.W.2d 152, 155 (Tex. Crim.App.1982), *cert. denied,* 464 U.S. 863, 104 S.Ct. 194, 78 L.Ed.2d 171 (1983).

**3.** However, prior to a finding that an accused has established a prima facie case under *Batson,* any attempt to require the prosecutor to explain his peremptory challenges would be improper. *See Tompkins,* slip op. at 5.

■ We hasten to add that conduct of the *Batson* hearing, the admission or exclusion of evidence, and the limitation, if any, of cross-examination are all subject to the applicable Texas Rules of Criminal Evidence and the trial court's inherent authority to control the conduct of the hearing.

■ We observe that the State contends, in its response to appellant's argument on this point, that appellant failed to preserve this error by failing to object and assert the constitutional right to cross-examine and that therefore any error was waived. Because of the substantial right of the accused that is affected, we are of the view that this contention begs the question, and the argument is rejected. Also, insofar as the conclusions reached by this Court in *Dewberry v. State*, 743 S.W.2d 260 (Tex. App.—Dallas 1987, pet. granted), conflict with the conclusions reached here, they are overruled.

We therefore abate this appeal and remand this case so that the trial court may conduct a *Batson* hearing. This hearing should be conducted in conformity with this opinion. If the court determines that appellant has established a prima facie case, the trial court should then require the State to come forward with a neutral explanation for the use of its strike. The appellant should have the opportunity to rebut evidence offered by the State, including cross-examination of the prosecutor. The trial court should then decide whether appellant has established purposeful discrimination, reduce that decision to writing, and enter its findings of fact and conclusions of law. The record of those proceedings together with the results and the findings of fact and conclusions of law are to be forwarded to this Court. *See Keeton v. State*, 724 S.W.2d at 66.

WHITHAM, HOWELL, McCLUNG, STEWART, ROWE and THOMAS, JJ., agree with the majority opinion.

ENOCH, C.J., and LaGARDE and OVARD, JJ., dissent with opinions.

KINKEADE and BURNETT, JJ., agree with dissenting opinion of ENOCH, C.J.

ENOCH, C.J., and BURNETT, J., agree with dissent of LaGARDE, J.

WHITTINGTON, J., concurs with dissent of ENOCH, C.J., and dissents in a separate opinion.

ENOCH, Chief Justice, dissenting.[1]

Today, the majority virtually eliminates the State's right to peremptory challenges. Therefore, I dissent.

There are two aspects of the majority's decision which are troubling. The first is the majority's disregard of decisions of the United States Supreme Court and the Texas Court of Criminal Appeals. Both those courts have ruled quite plainly that the State is not required to explain the reasons for its exercise of peremptory strikes until *after* a defendant has made a prima facie case of unlawful discrimination. *Batson v. Kentucky*, 476 U.S. 79, 97, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986); *Keeton v. State*, 724 S.W.2d 58, 65 (Tex.Crim.App. 1987), *opinion after abatement*, 749 S.W. 2d 861 (Tex.Crim.App.1988). There is good reason for this rule: to require the State to explain peremptory strikes before a defendant has made a prima facie showing of unlawful discrimination is to deny the State such strikes altogether, for a strike that must be explained is, by definition, not peremptory. *See* TEX.CODE CRIM.PROC. ANN. art. 35.14 (Vernon 1966). The United States Supreme Court expressly refused to abolish peremptory strikes by the State:

Nor do we think that this historic trial practice, which long has served the selection of an impartial jury, should be abolished because of an apprehension that prosecutors and trial judges will not perform conscientiously their respective duties under the Constitution.

*Batson*, 476 U.S. at 99 n. 23, 106 S.Ct. at 1724 n. 23. Nevertheless, the majority, without acknowledging this rule or the au-

---

1. This opinion was originally drafted by Justice Nathan L. Hecht. With Justice Hecht's ascension to the Supreme Court of Texas prior to issuance of the opinions in this case and because of my agreement with this dissent, I have adopted it as my own.

thorities and reasons which support it, hold:

An accused, when going forward with his burden of producing evidence *of a prima facie case of discrimination,* should have the right to adduce evidence sufficient to establish the criteria required by *Batson.* This right should include the opportunity to call witnesses, including the prosecutor as an adverse witness for direct examination, in the accused's attempt to satisfy the prima facie burden imposed upon him.

Maj.op. at 874 (emphasis added). In other words, the majority hold that a defendant is entitled *in every case* to summon the prosecutor to the stand and compel him to explain his exercise of peremptory strikes before the defendant has even made a prima facie showing of unlawful discrimination. The majority do not cite, nor can I find, a single case from any jurisdiction in this country that goes so far. At least two courts have rejected the majority's holding. Moreover, every court of which I am aware, including the highest courts of this state and nation, the highest court of at least one other state, and many federal appeals courts, have uniformly left to the trial courts the formulation of appropriate procedures for determining whether the State has unlawfully exercised its peremptory strikes. I would join them.

This brings me to the second troubling aspect of the majority's decision. Removing from trial judges the exercise of their discretion and imposing upon them a procedure which no other court in this country has prescribed displays a lack of trust in trial judges to enforce the Constitution. The United States Supreme Court does not share this lack of trust:

We have no reason to believe that prosecutors will not fulfill their duty to exercise their challenges only for legitimate purposes. Certainly, this Court may assume that trial judges, in supervising voir dire in light of our decision today, will be alert to identify a prima facie case of purposeful discrimination.

*Batson,* 476 U.S. at 99 n. 23, 106 S.Ct. at 1724 n. 23. Neither does the Texas Court of Criminal Appeals:

The Supreme Court was confident that the trial judiciary, experienced as it is in voir dire, would be able to determine whether the prosecutor's use of challenges created a prima facie case of discrimination.

*Keeton,* 724 S.W.2d at 66. Neither do I.

I find nothing in this case to justify a sweeping pronouncement that trial courts must follow certain procedures in all *Batson* hearings. I would leave formulation of those procedures to the sound discretion of the trial courts in each case. I find nothing in the record in this case to indicate that the trial court in any way denied Williams a fair opportunity to show that the State's exercise of its peremptory strikes was racially motivated. I would therefore overrule Williams' fifth point of error and proceed to consider her remaining complaints.

### I. *Facts of Jury Selection*

Williams' claimed right to cross-examine the prosecutor must be viewed in context. Six members of the venire in this case were black, the same race as Williams, but only four of them were among the first 45 members of the panel actually considered for selection to the jury. One of the four, Mr. Graham, seated 21 in the array, was excused for cause. Another, Ms. Douglas, seated 38 in the array, was selected for the jury. The other two, Mr. Adams and Ms. Moore, seated, respectively, 27 and 35 in the array, were peremptorily challenged by the State. Only one of the two, Ms. Moore, was, Williams complains, challenged for racially discriminatory reasons.

During the voir dire of the jury panel, the prosecutor asked, "Is there anyone that has any kind of moral or religious or conscience reasons why they feel they couldn't sit in judgment of someone else?" Three members of the array, Mr. Graham, Ms. Moore, and Mr. Adams, responded affirmatively and were questioned further by the prosecutor. Ms. Moore, who listed her reli-

gious preference as "Holliness [sic] Pentecost", responded as follows:

Q [By the Prosecutor]: Okay. Ms., let's see, it's Ms. Moore, right? You are raising your hand?

A [By Ms. Moore]: Yes, I have my hand. My religion is the one thing that requires me not to swear, and but I could serve on it but I could sit in judgment of someone. I wouldn't set a judgment of death on no one.

Q Well, you are saying that you could judge someone but—I didn't hear the last part?

A I wouldn't set death on someone for penalty for anyone.

Q Okay.

A But I think a person, if they committed a crime, can prove if they committed it they are supposed to be punished, but I don't swear.

Q All right. So you are saying that you could follow the range of punishment in this case which does not include a death penalty. It's from five to life, right?

A Uh-huh.

Q But you would have a problem with swearing to tell the truth or what are you saying?

A I'll tell the truth.

Q You said you don't swear; I assume that meant taking an oath?

A No, based on the Bible that you are not supposed to swear, but I will tell the truth.

Q All right.

Later, at the bench, the following colloquy occurred:

THE COURT: Ms. Moore.

Q [By the Prosecutor]: Hello, Ms. Moore. I had asked you a question and I believe you had indicated to me that you may have some maybe religious reasons or some moral reasons why you felt you wouldn't be able to judge somebody in a trial?

A [By Ms. Moore]: No, I didn't say I wouldn't be able to judge anybody, I just said I didn't swear, I didn't believe in the death penalty. That's the only things I said.

Q What do you mean?

THE COURT: Excuse me just a minute. I think I can clear this up.

[The Prosecutor]: Okay.

THE COURT: Ms. Moore, if you are on the jury you have to take an oath; however, I will form—the words of that oath will be, "Do you solemnly swear or affirm that you would follow the evidence and render a verdict based only on the law and the evidence so help you God." Now that oath, you could take that one, could you not?

A [By Ms. Moore]: Yeah, I can take that one.

THE COURT: All right. Go ahead.

Q [By the Prosecutor]: So you don't have any problems as far as being able to vote if you were chosen as a juror and be able to render a verdict either guilty or not guilty.

A No, I wouldn't have any trouble at all.

Q I'm sorry.

A I said no, I wouldn't have any trouble.

Q Okay. I'll pass the witness.

[Williams' Counsel 1]: No questions.

[Reed's Counsel [2]]: No questions.

THE COURT: All right. Thank you, Ms. Moore.

Following the voir dire examination of the jury panel, and before the jury was sworn, Williams filed a written motion for "a hearing to determine the State's basis for striking [certain] jurors from the panel." The trial court summarily denied the motion, apparently for the sole reason that one of the jurors seated was black. Later, however, after Williams filed an offer of proof containing the facts we have summarized in the first paragraph above, the trial court reconsidered and granted Williams' motion, and the following proceedings occurred:

THE COURT: Let the record reflect this is outside the presence and hearing of the jury. Prior to the jury being

---

2. Williams' sister, Cheryl Reed, was a co-defendant.

sworn in, the Defendant Williams moved for a hearing under *Batson versus Kentucky*. The motion was joined by Defendant Reed. At that time the motion for hearing was denied by the Court. Upon re-consideration the Court now grants the defendant's motion for hearing under *Batson versus Kentucky*.

Does the State wish to present evidence?

[The Prosecutor]: Yes, Your Honor.

THE COURT: In what form?

[The Prosecutor]: Well, the State—in response to the motion my understanding—

THE COURT: Well, it actually would be in response to the defendant's offer of proof, unless you wish to put on something else....

[Williams' Counsel 2]: Judge, if there is any response to the offer of proof, we would have to put something on. If there in not, then we will stand on the offer of proof.

THE COURT: All right.

[The Prosecutor]: Could I have just a moment, Your Honor, to see the offer?

THE COURT: You may.

[The Prosecutor]: State would call [myself] to testify.

THE COURT: Raise your right hand.

(Witness sworn.)

THE COURT: [Ms. Prosecutor], it's the Court's intention that the Court will inquire of [the prosecutor] in regard to certain matters....[3]

\*     \*     \*     \*     \*     \*

In regard to the venireman [Ms. Moore] ..., what was your reason for peremptorily challenging that venireman?

[The Prosecutor]: When the State asked the entire panel if anyone had a religious, moral or personal reason that they felt they would not be able to sit in judgment of these defendants either at guilt/innocence or punishment, three people raised their hand, Ms. Moore, Ms. Adams and Mr. Morgan—no, I'm sorry,

Mr. Graham. Mr. Graham, of course, was excluded by the Court for cause and Mr. Adams was also struck by the State peremptorily, as I testified earlier.

Ms. Moore raised her hand, said she had a religious problem with sitting in judgment, and then after further questioning at the bench, she said that she couldn't swear, something to that nature. I wasn't convinced after questioning that she would be able to sit in judgment based on her religious problems and her other responses as far as punishment.

THE COURT: Do you have any further evidence to present?

[The Prosecutor]: No, Your Honor.

THE COURT: [Williams' Counsel 2]?

[Williams' Counsel 1]: May I inquire of [the prosecutor]?

THE COURT: I'm sorry, I will not allow cross-examination of the Assistant District Attorney. If you have further evidence to present, [either counsel for the defense], I'll hear that.

[Williams' Counsel 1]: Yes, Your Honor, I would like to testify just a little bit.

(Witness sworn.)

[Williams' Counsel 1]: ... I am one of the attorneys representing Donna Williams in the case now on trial before the Court. In regard to jury selection which commenced on May 18th, 1987, and which was concluded on May 19th, 1987, [Ms. Moore] ... was stricken peremptorily by the State from the jury panel. Ms. Moore, during the Voir Dire Examination of the State of Texas, made a reference to not being able to sit in judgment on people but also referred at that time to something having to do with the death penalty and further inquiry was not made by the State concerning exactly what she meant. She also made some reference at that time to not being able to swear. There was no inquiry at that time or at the bench by the State concerning her ability to consider the full range of punishment to my recollection, and upon inquiry by the Court, specific inquiry that is.

---

**3.** The discussion as to the State's peremptory challenge to Mr. Adams is omitted inasmuch as Williams does not now complain of this challenge.

Upon inquiry of the Court of the general panel and of the general panel by [the prosecutor], Ms. Moore did not respond that she could not consider the full range of punishment. Further, at the bench after Voir Dire of the general panel had been concluded, Ms. Moore stated that she could not assess the death penalty, and upon being advised by the Court that this was not a death penalty case, she unequivocally stated that she could sit in judgment of the defendants in this case and would be able to participate fully as a juror with respect to this case, and also upon explanation by the Court that she would be required to either swear or affirm to tell the truth—or to render a true verdict, Ms. Moore unequivocally indicated that she could take that oath and act as a juror.

Therefore, given the statements of the prosecutor with respect to answers to punishment questions and sitting in judgment and taking an oath, there is no evidence or no conclusion can be drawn other than Ms. Moore was struck—one moment, Your Honor. Strike the last few words.

There are other individuals who are on this jury panel who were white members of that panel who responded similarly to that of Ms. Moore ... throughout the Voir Dire Examination and therefore, given Ms. Moore's affirmative response to being able to consider the full range of punishment, her affirmative response that she could sit in judgment in this case and her affirmative response that she was able to take the oath to be administered by the Court, it may only be concluded that she was stricken because she is a black woman; therefore, a member of a cognizable racial minority which denies to Donna Williams her rights under the Fifth and Fourteenth Amendments of the United States Constitution and Article One, Section 19 of the Texas State Constitution. We object to this jury on that ground.

[The Prosecutor]: Your Honor, may I put something else on the record—

THE COURT: Well—

[The Prosecutor]: —when he's through?

THE COURT: Is there anything further?

[Williams' Counsel 2]: And with regard to—not in a situation of further evidence on the part of the Defense, on the part of Ms. Williams, we would object to the failure of the Court to allow us to cross-examine [the prosecutor] for the reason that such denies Ms. Williams her opportunity to test the statements made by [the prosecutor], and it denies her her right to effective assistance of counsel under the Sixth Amendment of the United States Constitution, Article One, Section 10 of the Texas State Constitution.

THE COURT: Your objection is overruled. Do you have anything further?

[Williams' Counsel 1]: Nothing further, Your Honor.

THE COURT: [The prosecutor]?

[The Prosecutor]: Yes, Your Honor. I believe the record will reflect that when the State asked that question regarding religious or moral reasons, there were only three people who raised their hands, all of which were of the minority distinction, being black. One was [Mr. Adams]. One was Ms. Moore and one was Mr. Graham, none of which appeared on the panel on the jury, [Mr. Adams] being struck by the State in addition to his problems with sitting in judgment, the aforementioned reasons of him having another conviction he did not admit to. Mr. Graham was struck for cause or released for cause, one of which being his religious reason and Ms. Moore, who also showed a hesitancy initially because of religious reasons to sit in judgment....

THE COURT: Anything further [from the prosecutor]?

[The Prosecutor]: No, Your Honor.

THE COURT: [Williams' Counsel 1 or 2]?

[Williams' Counsel 2]: Nothing.

[Williams' Counsel 1]: Nothing.

THE COURT: The Court makes the following finding of fact in regard to the

defendant's motion: that the State did not exercise its peremptory challenges in a way to purposefully discriminate on the basis of race.

Anything further?

[Williams' Counsel 1]: Nothing on this hearing, Your Honor.

## II. Merits of Appeal
### A. Two-step *Batson* Hearing

To determine whether the State has unlawfully discriminated on the basis of race in the exercise of its peremptory challenges, the trial court is to follow a two-step process. *Batson v. Kentucky*, 476 U.S. 79, 96–98, 106 S.Ct. 1712, 1722–1724, 90 L.Ed.2d 69 (1986); *Keeton v. State*, 724 S.W.2d 58, 65 (Tex.Crim.App.1987), *opinion after abatement*, 749 S.W.2d 861, 865 (Tex.Crim.App.1988). The first step is to afford the defendant the opportunity to "establish a prima facie case of purposeful discrimination." *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723; *see Keeton*, 724 S.W.2d at 65. To do so, the defendant must show three things: (1) that he is a member of a cognizable racial group; (2) that the State has excluded members of the same racial group from the jury by the exercise of its peremptory challenges; and (3) that the circumstances of the entire jury selection process raise an inference that the State's exercise of its peremptory challenges was racially motivated. *See Batson*, 476 U.S. at 96, 106 S.Ct. at 1722–1723; *Keeton*, 724 S.W.2d at 65. There is no set formula for determining whether the defendant has met this initial requirement.

In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.

*Batson*, 476 U.S. at 96–97, 106 S.Ct. at 1722–1723. If and only if the trial court finds that the defendant has established a prima facie case of purposeful racial discrimination by the State, the trial court must, as the second step of the process, afford the prosecutor the opportunity to give a racially neutral explanation for his exercise of the State's peremptory challenges. *See Batson*, 476 U.S. at 97–98, 106 S.Ct. at 1723–1724; *Keeton*, 724 S.W.2d at 65.

The two-step nature of this process is not a make-work formality; it is key to the balancing of a defendant's equal protection right to a jury from which the State has not excluded members of the defendant's racial minority group, and the State's peremptory right to exclude from the jury whomever it chooses, among them persons who by nature may be less favorably disposed than others to its position. To require the State to justify its peremptory challenges without the defendant's first raising at least an inference of racial discrimination would be, in essence, to deny such challenges to the State. By definition, a peremptory challenge is one made "without assigning any reason therefore." TEX.CODE CRIM.PROC.ANN. art. 35.14 (Vernon 1966). The State is not required, any more than any other litigant, to defend the exercise of its peremptory strikes except when the defendant has not only charged but adduced some evidence from which it can at least be inferred that the State has unlawfully discriminated on the basis of race. Indeed, this Court has held:

> The State may, but should not be required to explain the reasons for its exercise of peremptory strikes merely out of an abundance of caution, but only after a finding of prima facie discrimination has been made.

*Adams v. State*, 740 S.W.2d 60, 62 (Tex. App.—Dallas 1987, no pet.).

In the instant case the trial court did not adhere to the two-step process directed by *Batson* and *Keeton.* Williams filed a motion for a *Batson* hearing alleging unlawful discrimination by the State in the most general terms. The trial court denied Williams' motion. Williams later filed an offer of proof which showed no more than that, of the three blacks on the venire available to serve on the jury, two were struck by the State and one was seated. The trial court then reconsidered its prior ruling and granted Williams a hearing. When Williams elected at that hearing to "stand on the offer of proof" unless the State responded to it, the trial court should have determined whether Williams had established a prima facie case of purposeful discrimination. Instead, the prosecutor, at the trial court's invitation, proceeded to offer an explanation for her peremptory challenges. The trial court's failure to follow the two-step procedure directed in *Batson* and *Keeton,* although improper, does not preclude appellate review of its finding that the State did not exercise its peremptory challenges unlawfully. *See Adams,* 740 S.W.2d at 62. Ordinarily, this Court would proceed to consider Williams' complaint that the trial court erred in its finding.

## B. No "Right" to Cross-examination

However, before considering Williams' complaint that the trial court erred in finding that the State did not unlawfully discriminate in exercising its peremptory strikes, the court must consider Williams' complaint that she was denied a fair opportunity to prove unlawful racial discrimina-

tion by the State in peremptorily challenging Ms. Moore because the trial court refused to allow her to cross-examine the prosecutor during the *Batson* hearing. Williams contends, and the majority hold, that her constitutional rights to a fair trial and effective assistance of counsel entitled her to such cross-examination.[4]

As noted above, a *Batson* hearing is structured to preserve as much as possible both the State's right to exercise its peremptory challenges without interference and the defendant's right to equal protection of the law. The responsibility for maintaining this difficult balance lies primarily with the trial judge who alone is best situated to discern, not only from what is said and done, but from what is left unsaid and undone, whether the defendant's rights are surreptitiously being violated. The trial court must "make 'a sensitive inquiry' into 'all relevant circumstances' in determining whether purposeful discrimination is shown." *Adams,* 740 S.W.2d at 61 (quoting *Batson,* 476 U.S. at 96–99, 106 S.Ct. at 1722–1724). In my view, doubt that trial courts will fulfill this duty underlies the majority opinion and motivates their prescription of fixed procedures.

Consistent with its recognition that the trial court's responsibility cannot be mechanically discharged, the United States Supreme Court expressly declined to prescribe procedures for the trial courts to follow beyond the basic two-step process. *Batson,* 476 U.S. at 99, 106 S.Ct. at 1724. The formulation of appropriate procedures it left to the trial courts in each case. *See United States v. Garrison,* 849 F.2d 103

---

4. Among the questions raised by the majority opinion is what it suggests about extending constitutional rights traditionally limited to trial on the merits to pretrial proceedings generally. There is little Texas authority on this issue, and our sister state courts are not in accord. The majority extend the right of cross-examination to the jury selection stage of trial because it "is of such vital importance to the accused" and "is part and parcel of the 'adversarial' nature of the trial on the merits." Maj.op. at 874. If the test of when constitutional rights of confrontation and cross-examination attach is to be whenever the proceedings are "important" and "adversarial," I see little reason not to extend these rights to all pretrial proceedings. I doubt that

the majority intend this result, but I see no way of avoiding it under their test. My view of this case does not require me to attempt any resolution of this larger issue because, as I explain, I believe that the nature and purpose of *Batson* hearings dictate that a defendant be afforded an opportunity to cross-examine the prosecutor only in some circumstances, within the sound discretion of the trial court. On this larger issue, I consider Justice Lagarde's dissent to be well reasoned. Therefore, I join in her dissent to the extent there is not a right to cross-examine, although, in my view, it may be an abuse of trial court discretion to deny defense counsel the opportunity, in certain cases, to cross-examine the prosecutor.

(4th Cir.1988); *United States v. Tucker*, 836 F.2d 334, 340 (9th Cir.1987); *United States v. Davis*, 809 F.2d 1194, 1201–02 (6th Cir.), *cert. denied*, 483 U.S. 1007, 1008, 107 S.Ct. 3234, 97 L.Ed.2d 740 (1987). The duty imposed upon the trial court to discern and prevent racial discrimination in the jury selection process while preserving the State's otherwise unrestricted freedom to exercise its peremptory challenges necessarily imports sufficient discretion to conduct any hearing on a defendant's complaint in the manner best calculated to discharge that duty, within the constraints of the two-step procedure directed by *Batson* and *Keeton*, and subject to other requirements of law. In my view, the trial court should have the same latitude in determining what procedures to follow as it has in determining what conclusion to reach. I would follow the Supreme Court's wisdom in not attempting to write rules for the myriad circumstances the trial courts face in discharging their responsibility under *Batson*. I would limit our review of the trial court's conduct of a *Batson* hearing to whether it abused its discretion.

The authorities on the issue before the court are squarely and unanimously against the majority. This Court has itself held not long ago that a defendant has no right to cross-examine the prosecutor during the first step of a *Batson* hearing, before a prima facie case of purposeful discrimination has been established. *Dewberry v. State*, 743 S.W.2d 260, 266 (Tex. App.—Dallas 1987, pet. granted). The Court reasoned that cross-examination was unnecessary in that case because anyone present in the courtroom, not just the prosecutor, could have testified to what occurred there to lead to an inference of unlawful discrimination. The majority summarily overrule *Dewberry*. The only state supreme court that has, to my knowledge, addressed the issue has squarely held "that a defendant who makes a *Batson* challenge does not have the right to examine the prosecuting attorney." *State v. Jackson*, 368 S.E.2d 838, 842 (N.C.1988). While I believe denying a defendant cross-examination of the prosecutor in all situations goes too far, I note simply that the weight of authority is against the majority's rule allowing such cross-examination in every case. The only federal appeals court to have addressed the issue, to my knowledge, has twice held that a defendant is not absolutely entitled to an evidentiary hearing, and thus cross-examination of the prosecutor, on a *Batson* objection in every case. *United States v. Tindle*, 860 F.2d 125 (4th Cir.1988); *United States v. Garrison*, 849 F.2d 103 (4th Cir.1988). In addition, every federal appeals court to have considered the matter has held that trial courts must be allowed considerable discretion in conducting *Batson* hearings. *United States v. Davis*, 809 F.2d 1194 (6th Cir.), *cert. denied*, 483 U.S. 1007, 1008, 107 S.Ct. 3234, 97 L.Ed.2d 740 (1987) (approved trial court's *in camera* consideration of prosecutor's reasons for exercising peremptory strikes); *United States v. Tucker*, 836 F.2d 334 (7th Cir.1988) (approved trial court's *in camera* consideration of prosecutor's reasons for exercising peremptory strikes); *United States v. Thompson*, 827 F.2d 1254 (9th Cir.1987) (refused to approve a trial court's ex parte consideration of a prosecutor's explanation for striking certain jurors absent some compelling justification for such procedure, but acknowledged the broad discretion of the trial court in conducting *Batson* hearings). The majority do not even acknowledge these cases or the reasoning they employ.

I stress that I would not deny a defendant the opportunity to cross-examine the prosecutor in every instance. For example, it seems to me that if the defendant were attempting during the first phase of a *Batson* hearing to raise an inference of discrimination by showing a course of conduct by the prosecutor in several trials, he should be entitled upon request and an explanation to the trial court of the purpose of his request, to examine the prosecutor, not about his reasons for his strikes in that case, but about his exercise of strikes in other cases. During the second phase of the hearing a defendant may make an even more compelling request to cross-examine the prosecutor who has just offered explanations for his strikes. To

avoid unnecessarily delaying the trial, however, cross-examination should accomplish more than just rehash what has just occurred during the voir dire. If a defendant made a compelling request for cross-examination which the trial court nevertheless denied, I would review the denial for any abuse of discretion.

### C. Cross-examination Subject to Discretion of Trial Court

The majority extend to defendants a constitutional right in every case to cross-examine prosecutors about their peremptory strikes whenever a defendant objects that the State has discriminated on the basis of race, even before the defendant has made a showing from which such discrimination can be inferred. The majority cite not one authority in support of their remarkable holding, nor can they, as all authority is to the contrary. The majority do what no other court has yet proposed: they tie the trial courts' hands and require that they sit by while counsel engage in colloquy always unseemly and seldom productive. I am convinced the majority holding will only further delay the trial courts in their duties. If it provided greater assurance of no racial discrimination in jury selection, perhaps it would be worth it. I doubt, however, whether the outcome of many cases will turn on testimony elicited from a prosecutor on cross-examination in a *Batson* hearing.

In this case, although the trial court did not find that Williams made a prima facie case of discrimination, indeed, rather plainly failed to do so, it nevertheless invited the prosecutor to explain her peremptory challenges, which invitation she accepted. However, the prosecutor was examined, not by counsel for the State, but almost entirely by the trial court. Furthermore, the prosecutor's testimony as to Ms. Moore merely recited what had happened during voir dire and added nothing to what a courtroom spectator would have known

merely from listening to those proceedings. The prosecutor's credibility was thus not placed in issue. Even had it been, the trial court as examiner had sufficient opportunity to test it. Finally, Williams never stated to the trial court, and has not told this court, what evidence she expected to elicit from the prosecutor by cross-examination that she could not obtain from other sources.

I would hold that whether to allow a defendant to cross-examine the prosecutor in a *Batson* hearing is a decision committed to the sound discretion of the trial court. I would find in this case no abuse of that discretion, and would therefore overrule Williams' fifth point of error. Consequently, I dissent.

LAGARDE, Justice, dissenting.

In an opinion wide in scope and shallow in rationale, the majority today have held that the criminal defendant in a *Batson*[1] hearing is not only entitled to an *adversarial* hearing but is also entitled to cross-examination of the State's representative at that hearing.[2] And not content to limit its holding to the case at bar, the majority purport to set up certain *general* procedural rules to be followed *in all cases* involving a *Batson* hearing. I am at a loss to know by what authority they have such supervisory power. Although I agree with Justice Enoch's dissenting opinion that the limits of the inquiry should be within the sound discretion of the trial judge, I would go further and hold that there is no right to cross-examine the prosecutor at a *Batson* hearing. I write separately to state considerations that have led me to that conclusion.

In order to understand the competing interests involved and the impact of today's holding, I find it helpful to carefully examine the *Batson* decision itself—from whence it came and to whence it appears to be going. It is against this *Batson* back-

---

1. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

2. In footnote three, the majority have stated that prior to establishing a prima facie case, any

attempt to require the prosecutor to explain his peremptory challenges would be improper. *See Tompkins v. State,* No. 68,870, slip op. at 5, (Tex. Crim.App. Oct. 7, 1987).

drop that I have concluded that the confrontation clause of the Sixth Amendment, made applicable to the States through the Fourteenth Amendment, which gives a defendant the right "to be confronted with the witnesses against him," should not be extended to cross-examination of the State's representative, the prosecutor, at a *Batson* hearing.

### Batson v. Kentucky

In 1986, the Supreme Court, in *Batson*, lessened the evidentiary burden that a criminal defendant must meet to establish a denial of equal protection through the State's use of peremptory challenges to exclude members of his race from the petit jury. Throughout the litigation of the issue in the Kentucky state court system, Batson conceded that his equal protection claim was foreclosed by *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) and only urged his federal constitutional right, under the Sixth Amendment, to a jury drawn from a cross-section of the community.[3] The equal protection claim, except as permitted by *Swain*, was apparently never urged, briefed or argued. *See Batson*, 106 S.Ct. at 1715, 1731. Nevertheless, the Supreme Court chose to base its holding on the equal protection clause of the Fourteenth Amendment rather than on Sixth Amendment grounds. The Court explains its equal protection choice in a footnote. *Batson*, 106 S.Ct. at 1716 n. 4. The Court agreed with the State that reconsideration of its holding in *Swain* was necessary to resolve the issue inasmuch as the State relied on *Swain* as a basis for affirmance. It expressed no view on the merits of Batson's Sixth Amendment claim. *Id.*[4]

In *Swain*, the Court had considered two types of peremptory challenges—first, those made for the purpose of prevailing in the specific case at bar, or in other words a case-specific challenge, and second, those made for the purpose of excluding black jurors, or a non case-specific challenge. The Court in *Swain* upheld the case-specific challenge and, although its holding turned on a failure of proof and not on the unconstitutionality of the non case-specific challenge, it intimated that a non case-specific challenge would be unconstitutional.

The *Batson* decision does not expressly overrule *Swain*. *Batson* states that *Swain* is overruled only to the extent that anything in *Swain* is contrary to the principles articulated in *Batson*. *Batson*, 106 S.Ct. 1725 n. 25. The only conflict, in my view, is one of the evidentiary burden. *Batson*, unlike *Swain*, allows a criminal defendant to make a prima facie showing of purposeful racial discrimination by relying *solely* on the facts concerning the jury's selection *in his case*. *Batson*, 106 S.Ct. at 1722. *Batson* created a new remedy, not a new right. *Seubert v. State*, 749 S.W.2d 585, 588 (Tex.App.—Houston [1st Dist.] 1988, no pet.).

In *Batson*, the Court seems to use the equal protection clause as a means to an end, *i.e.*, to eliminate racial discrimination in the exclusion of black citizen-jurors (thereby protecting society's interest) as a means to the end of a fair and impartial jury to decide the guilt or innocence of the particular criminal defendant on trial (thereby protecting the individual's right). Thus, as I read *Batson*, I find that it implicates the right to a fair and impartial jury although it does not bottom its holding on the Sixth Amendment.

The Court states:

Racial discrimination in selection of jurors harms not only the accused whose life or liberty they are summoned to try. Competence to serve as a juror ultimately depends on an assessment of *individual qualifications* and ability *impartially* to consider evidence presented at a trial.... A person's race simply "is un-

---

3. He also based his claim of an impartial jury right on the Kentucky State Constitution.

4. It is noted that *Swain* was decided in 1965, three years prior to the Sixth Amendment being made applicable to the states in *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d

491 (1968). In *De Stefano v. Woods*, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968) (per curiam), the Court held that *Duncan* was inapplicable to cases in which trial began prior to the date of the *Duncan* decision.

related to his fitness as a juror." [*Thiel v. Southern Pacific Co.*, 328 U.S. 217] at 227, 66 S.Ct. [984] at 989 [90 L.Ed. 1181 (1946)] (Frankfurter, J., dissenting).

*Batson*, 106 S.Ct. at 1717–18 (emphasis added).

It is significant, at least to me, that *Batson* did not apply traditional or conventional equal protection principles but limited its application of those principles to *race*. In doing so, the Court apparently recognized that the passage of the Fourteenth Amendment was primarily directed toward racial discrimination, but specifically failed to recognize, at least in its holding, the extent to which equal protection has now been applied. Clearly its holding is a *limited* application of equal protection principles.

The Court goes on to say that "[s]election procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." *Batson*, 106 S.Ct. at 1718. Although I agree wholeheartedly with the wisdom of assuring public confidence, I do have doubts that *unequal* application of the *equal* protection guarantee serves that worthy goal. I read *Batson* as an effort to strike a balance between institutional and individual interests.

But, I further conclude that by resting its holding on the equal protection clause the Court in *Batson* also, either consciously or subconsciously, sought a remedy which would place a lesser burden of proof on the State in the context of a criminal trial. Because the Court "express[ed] no views on whether the Constitution imposes any limit on the exercise of peremptory challenges by defense counsel," *Batson*, 106 S.Ct. at 1718 n. 12, and only allowed limited *judicial inquiry* of the prosecutor, I do not find this insignificant. By applying the equal protection clause, the burden of persuasion remains at all times on the criminal defendant. The only burden on the State is to give a "racially-neutral"[5] reason for its strike *if and only if* the trial court finds

that the defendant has established an *inference* of racial discrimination. If an inference of racial discrimination is established, *Batson* then requires an explanation by the prosecutor. If the prosecutor states a reason which is accepted by the Court, that does not mean the State wins—that simply means that the inference is rebutted. The burden of persuasion remains on the defendant. The trial court could conclude that the reason given is a legitimate reason and still find purposeful discrimination based on the totality of the circumstances. In deciding if the defendant has carried his burden of persuasion, a court must undertake "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Batson*, 106 S.Ct. at 1721.

On the other hand, if the decision had been based on the Sixth Amendment, the State would have had a heavier burden. In *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 670 n. 26, 58 L.Ed.2d 579 (1979), a case decided on the Sixth Amendment, the Court stated:

Those equal protection challenges to jury selection and composition are not entirely analogous to the case at hand. In the cited cases, the significant discrepancy shown by the statistics not only indicated discriminatory effect but also was one form of evidence of another essential element of the constitutional violation—discriminatory purpose. Such evidence is subject to rebuttal evidence either that discriminatory purpose was not involved or that such purpose did not have a determinative effect. *See Castaneda* [*v. Partida*] *supra*, 430 U.S. [482] at 493–495, 97 S.Ct. [1272] at 1279–1280 [51 L.Ed.2d 498 (1977)]; *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). In contrast, in Sixth Amendment fair-cross-section cases, systematic disproportion itself demonstrates an infringement of the defendant's interest in a jury chosen from a fair community cross section.

---

5. The *Batson* decision is not internally consistent. At one point it speaks in terms of challenges based *solely* on racial discrimination, 106 S.Ct. at 1719, yet at another it requires the State

to state a "racially-neutral" explanation related to the particular case to be tried. 106 S.Ct. at 1723.

The only remaining question is whether there is adequate justification for this infringement.

*Id.* 99 S.Ct. at 670 n. 26. In my view, the majority here impose such a burden on the State. They state: "In the context of a *Batson* hearing such other evidence must include a racially neutral explanation by the prosecuting attorney and must be *legally adequate* to support a judgment in favor of the State." However, they do recognize, at least in form, that the burden of persuasion never shifts.

In light of *Batson* itself and in light of the historical, and present, use of the peremptory challenge as a means to an end, *i.e.,* that by the process of elimination of jurors perceived to be partial to one's opponent, an *impartial* jury results, one might wonder why the Court based its holding where it did. *See Batson,* 106 S.Ct. at 1732 (Burger, C.J. dissenting joined by Rehnquist, J.). By its effort to protect the individual interest through the institutional interest, perhaps it sought to serve not only the end of reality, but also the end of appearance. In addition to the curious and questionable evolution of *Batson,* I also find other considerations significant.

### Institutional Biases

At the outset, the jurisprudential scales vis-a-vis the guarantee of an impartial jury are weighted against the State. Jurors are pledged to favor the defendant—the presumption of innocence requires partiality toward the defendant. The requirement of proof beyond a reasonable doubt favors the defendant. The unanimous verdict requirement [6] favors the defendant. The difficulty of ferreting out juror bias because of unreliable responses by jurors, made either subconsciously out of the human weakness of denial, or perhaps more often because of an overriding desire to serve on the jury, further skews the balance. And the concept of jury nullification should also be considered. The jury has the absolute prerogative to acquit in the face of compelling evidence and to do so with virtual impunity.

"Our criminal justice system requires not only freedom from any bias against the accused, but also from any prejudice against his prosecution. Between him and the state the scales are to be evenly held." *Batson,* 106 S.Ct. at 1729 (Marshall, J., concurring in part) (quoting *Hayes v. Missouri,* 120 U.S. 68, 7 S.Ct. 350, 351, 30 L.Ed. 578 (1887).

With a view toward evening the balance, I have reached the conclusion that Williams should not have a right of cross-examination.

### The Transformation of the Peremptory Challenge

In a recent decision extending *Batson* to civil actions between private litigants, on a theory that state action is involved,[7] a dissenting federal appeals justice stated:

What remains after today's holding is not the peremptory challenge which our procedure has known for decades—or not one which can be freely exercised against all jurors in all cases, at any rate. Justice Marshall would dispense with strikes entirely, and perhaps this will be the final outcome. *Batson* 476 U.S. at 106–8, 106 S.Ct. at 1728–9 (Marshall J., concurring). In this much at least he is surely correct, that we must go on or backward; to stay here is to rest content with a strange procedural creature in-

---

**6.** Although there is no requirement in the United States Constitution of unanimity, such a requirement does exist under Texas law. *See Molandes v. State,* 571 S.W.2d 3, 4 (Tex.Crim. App.1978); TEX. CONST. art. 5, § 13; TEX. CODE CRIM.PROC.ANN., arts. 37.03, 36.29.

**7.** The fifth federal circuit court found state action in the Supreme Court decisions in *Tulsa Professional Collection Services v. Pope,* 485 U.S. 478, 108 S.Ct. 1340, 1345, 99 L.Ed.2d 565 (1988); *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 2755, 73 L.Ed.2d 482 (1982); *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961) and *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). The rationale applied by the majority, in *Edmondson,* it seems to me, would necessarily result in defense counsel— particularly court-appointed counsel or public defenders—being state actors. This in spite of the holding in *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) that a public defender employed by the State is not a state actor.

deed: a challenge for semi-cause, exercisable differentially as to jurors depending on how the ethnic group to which they belong correlates with that of the striker's client—a skewed and curious device, exercisable without giving reasons in some cases but not in others, all depending on race.

*Edmonson v. Leesville Concrete Co., Inc.,* 860 F.2d 1308, 1317 (5th Cir.1988) (Gee, J. dissenting).

### Role of the Trial Judge

Although the Court in *Batson* purports to specifically address the "evidentiary burden" of its *Swain* decision, it is silent as to any further guidance concerning whether an adversarial process is required and, if so, the issue of cross-examination. The Court speaks in terms of "the *trial court*," and *"judicial"* inquiry and "a *court* undertak[ing] a sensitive inquiry ..." *Batson,* 106 S.Ct. at 1721 (emphasis added). Perhaps that is because "the obligation to impanel an impartial jury lies in the first instance with the trial judge...." *Rosales–Lopez v. United States,* 451 U.S. 182, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981). To the large extent credibility is a factor, the credibility choice is to be determined *exclusively* by the trial court. Its findings are to be given "great deference." *Batson,* 106 S.Ct. at 1724 n. 21. Who, then, is better than the one to be convinced to determine what is needed to convince him or her? Further, the credibility of the prosecutor is not a predominate factor in the evaluation. *See Seubert v. State,* 749 S.W.2d at 589 (Hoyt, J. concurring). Justice Hoyt states:

> To begin this process, a trial judge has a duty to examine and evaluate the State's explanation using a three-part test: First, the trial judge must determine whether the explanation is facially adequate; second, whether the explanation is refuted by the record; and finally, if both prior questions are resolved in the affirmative and negative, respectively, his decision turns on the credibility of the witnesses. *See Slappy v. State,* 503 So. 2d 350 (Fla.Dist.Ct.App.1987). An appellate court evaluates the trial court's find-

ings and conclusions following this three-pronged test keeping in mind that the first two prongs require evaluation as questions of law. In essence, whether the explanation is facially adequate or refuted by the record is a question of law.

... When the State gives its explanation, a trial court cannot view its role as simply evaluating the evidence from a believability standard. Simply concluding that the State's response is racially neutral and that the State intended no harm are inappropriate conclusions. This approach overlooks the first part of the evaluation process and permits the third area, concerning the credibility of the State's response, to predominate the evaluation. A prosecutor may not rebut a defendant's prima facie case merely by denying a discriminatory motivation, or by affirming his good faith in individual selections. It is incumbent upon the prosecutor to articulate a clear and reasonably specific *neutral explanation related to the particular case to be tried. Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986) (Emphasis added).

An explanation is facially adequate if after its examination, an inference of bias on the part of the *juror* relative to the law, the case, the parties, the attorneys, or the subject matter can be discerned. This is to say that a venireperson must express a trait or characteristic peculiar to him that may otherwise prejudice or color his reasoning, thereby preventing him from following the law and instructions in the case. In short, the bias must be individual bias of the venireperson; not a group bias or that of the prosecutor. *People v. Turner,* 42 Cal.3d 711, 230 Cal.Rptr. 656, 726 P.2d 102 (1986).

As a practical matter, the trial judge's credibility choice as to the prosecutor's explanation will no doubt be directly related to the judge's own evaluation of the juror's impartiality as to the law, the offense, the parties and the attorneys, and cross-exami-

nation of the prosecutor would add nothing to the inquiry.

### Ineffective Assistance of Counsel

By holding that a criminal defendant has an absolute right of cross-examination in a *Batson* hearing the majority, in my view, impose a burden on defense counsel to risk an ineffective assistance claim if he or she fails to (a) file a *Batson* motion and (b) to cross-examine the prosecutor in virtually every case, even though he or she may feel there is absolutely no reason to do so. *Cf. Randle v. State*, 760 S.W.2d 30, 32 (Tex. App.—Houston [1st Dist.] 1988, no pet.) (abating appeal and ordering trial court to assure defendant's right to effective assistance on appeal where counsel failed to assert a *Rose*[8] point of error on appeal).

### Inquisitorial v. Adversarial

The majority state:

the selection of a fair and impartial jury to hear the case on the merits is of such vital importance to an accused that we conclude and hold the selection process is part and parcel of the "adversarial" nature of the trial on the merits. When a *Batson* motion is timely made, the trial court should conduct the hearing in an adversarial manner.

"The obligation to impanel an impartial jury lies in the first instance with the trial judge...." *Rosales–Lopez v. United States*, 101 S.Ct. at 1634. I have found no Texas authority to the contrary.

In *Singer v. United States*, 380 U.S. 24, 85 S.Ct. 783, 790, 13 L.Ed.2d 630 (1965), a unanimous Court, speaking through Chief Justice Warren, stated:

The Constitution recognizes an *adversary* system as the proper method of determining *guilt*, and the Government, as a litigant, has a legitimate interest in

seeing that cases in which it believes a conviction is warranted are tried before the tribunal which the Constitution regards as most likely to produce a fair result....

The Sixth Amendment's confrontation clause provides: "In all criminal prosecutions, the *accused* shall enjoy the right ... to be confronted with the witnesses against him" (emphasis added). This Sixth Amendment right is secured for criminal defendants in state court. *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965). However, it has been held to be a *trial* right. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 999, 94 L.Ed.2d 40 (1987) (emphasis added).

I find no Texas case that has held that the right of cross-examination applies to preliminary proceedings. Other jurisdictions have reached conflicting results. However, most of the times cross-examination has been allowed in preliminary proceedings, it goes to matters involving *evidence against the accused*. In the limited context of a *Batson* hearing, in Texas the prosecutor becomes an "accused."[9] When considered in light of the Fifth Amendment,[10] I find this particularly troublesome.

It is well established in Texas law that the conduct of voir dire examination rests within the sound discretion of the trial court, and only an abuse of discretion will call for reversal. *Clark v. State*, 608 S.W. 2d 667, 670 (Tex.Crim.App.1980). If the defendant has a right of cross-examination, the trial court's discretion is subordinate to the defendant's right of cross-examination sufficient to satisfy the confrontation clause of the Sixth Amendment, *United States v. Vasilios*, 598 F.2d 387, 389 (5th Cir.1979), *cert. denied*, 444 U.S. 1049, 100 S.Ct. 742, 62 L.Ed.2d 737 (1980). I would hold that the defendant does not have a

---

8. *Rose v. State*, 752 S.W.2d 529 (Tex.Crim.App. 1988) (op. on reh'g).

9. *See* TEX.PENAL CODE ANN. § 39.02(a)(2) ("A public servant acting under color of his office or employment commits an offense if he ... intentionally denies or impedes another in the exercise or enjoyment of any right, privilege, power, or immunity, knowing his conduct is unlaw-

ful.") An offense is a Class A misdemeanor. § 39.02(c).

10. U.S. CONST. amend. V. I recognize that, like the Sixth Amendment right to confrontation, the Fifth Amendment right against self-incrimination is not absolute; however, it should be worthy of consideration and, at least, mention.

right of cross-examination of the prosecutor during a *Batson* hearing.

Considering the "given" in *Batson* that "the defendant is entitled to *rely* on the fact ... that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate'" (emphasis added), 106 S.Ct. at 1723 *quoting Avery v. Georgia*, 345 U.S. 559, 73 S.Ct. 891, 892, 97 L.Ed. 1244 (1953), the myriad of variables that arise in each case, and the case-specific requirement of *Batson*, assuming proper application of the rules of evidence, there would be little, if anything at all, to be gained by cross-examination. Given *Batson's* extremely limited encroachment of the prosecutor's exercise of the peremptory, I believe it should be just as narrowly applied. Otherwise, the State's right to peremptory challenge is sacrificed with no resulting value toward eliminating racial discrimination in jury selection.

### *Supervisory Role*

Not being content to limit the holding to the case at bar, the majority purport to set up a *procedure* to be followed in all *Batson* hearings. By doing so, it goes too far, in my view, and casts itself in a supervisory role over the district court.

I recognize that *federal* appellate courts possess broad supervisory powers over lower *federal* courts and have invoked that power to "preserve judicial integrity" over other federal courts. *See United States v. Leslie*, 783 F.2d 541, 568, 570 n. 2 (5th Cir.1986) (Williams, J. dissenting). *Id.* at 570 n. 2. Their authority, however, is based on a congressional grant of power. I know of no State counterpart. And in fact, the federal courts have no supervisory role over state courts. *United States v. Leslie*, 783 F.2d at 570 n. 2 and 572. Further, the Court of Criminal Appeals recently cautioned against issuing advisory opinions. *See Garrett v. State*, 749 S.W.2d 784, 803–04 (Tex.Crim.App.1988) (on State's motion for rehearing). Even the Court of Criminal Appeals has limited rule-making authority. I am, therefore, at a loss to

know the basis of this Court's assumed supervisory and rule-making power.

### *Article 35.261* [11]

Responding to *Batson*, the Texas legislature in 1987 enacted article 35.261 which provides:

(a) After the parties have delivered their lists to the clerk under Article 35.26 of this code and before the court has impanelled the jury, the defendant may request the court to dismiss the array and call a new array in the case. The court shall grant the motion of a defendant for dismissal of the array if the court determines that the defendant is a member of an identifiable racial group, that the attorney representing the state exercised peremptory challenges for the purpose of excluding persons from the jury on the basis of their race, and that the defendant has offered evidence of relevant facts that tend to show that challenges made by the attorney representing the state were made for reasons based on race. If the defendant establishes a prima facie case, the burden then shifts to the attorney representing the state ·to give a racially neutral explanation for the challenges. The burden of persuasion remains with the defendant to establish purposeful discrimination.

(b) If the court determines that the attorney representing the state challenged prospective jurors on the basis of race, the court shall call a new array in the case.

Had the legislature felt the need to prescribe certain procedures to be followed in a *Batson* hearing, it could have done so. It did not. Had the legislature felt the need for state appellate courts to have supervisory power to preserve the "integrity of the judicial system" it could have given them that power. It did not. If the suspicion and distrust of prosecutors and trial judges, which the majority suggest, is warranted, the majority should be concerned that they are providing an easy vehicle by which a creative and cunning prosecutor

---

**11.** TEX.CODE CRIM.PROC.ANN. art. 35.261     (Vernon Supp.1989).

can cause to be discharged a jury array which he or she finds unacceptable.

Article 35.261 already provides a vehicle by which a trial judge can achieve that result, if so inclined. By its decision today, the majority further extend that vehicle to the prosecutor. Because *experience* has taught me otherwise, I do not view either prosecutors or trial judges with such suspicion and distrust. Neither does the Supreme Court, who puts "considerable trust" in the trial judge. *See Batson*, 106 S.Ct. at 1725.

Based on the foregoing considerations, in addition to many of the reasons stated by Justice Enoch, I would hold that *Batson* contemplates *judicial inquiry* of the prosecutor at a *Batson hearing*, and would further hold that Williams had no right to cross-examination of the prosecutor, but at most a privilege, and that the privilege was subject to the sound discretion of the trial court. Finding no abuse of discretion, I would overrule Williams' fifth point of error.

Concerning Williams' point of error number six, that the trial court erred in giving unconstitutional parole law instructions, I would hold that it was error, *Rose v. State*, 752 S.W.2d 529 (Tex.Crim.App.1988), but that the error was harmless beyond a reasonable doubt. TEX.R.APP.P. 81(b)(2). I have examined the remaining points of error and found them to be without merit for the reasons stated in the State's appellate brief. I would therefore, affirm.

OVARD, Justice, dissenting.

I respectfully dissent. The majority diminishes the use of peremptory challenges and the discretion of the trial court further than the delicate balance approach authorized by *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

In order to invoke the protection set forth in *Batson*, a defendant must first raise an inference of purposeful discrimination and the trial court must determine that a prima facie case of discrimination exists through the state's use of its peremptory challenges. *See Batson*, 476 U.S. at 95–99, 106 S.Ct. at 1722–23. *Keeton v. State*, 724

S.W.2d 58, 65 (Tex.Crim.App.1987). Then, and only then, does the burden shift to the State to come forward with a racially neutral explanation as to why peremptory challenges were exercised to strike the jury panel members. *See Tompkins v. State*, No. 68,870, slip op. at 5 (Tex.Crim.App. Oct. 7, 1987) (not yet reported). Under *Tompkins*, only when the burden has shifted to the State may the State's attorney be called upon to testify as to the peremptory challenges. *Id.* At the conclusion of the prosecutor's testimony the defendant may conduct its cross-examination. A close analysis of this case shows that the evidence did not raise an inference of purposeful discrimination and, therefore, the burden of proof never shifted to the State.

The State's mere striking of a jury panel member who was of the same race as the defendant is not enough to raise an inference or a prima face case of purposeful discrimination regarding the State's use of its peremptory challenges. The defendant must show such facts, and any other relevant circumstances, that raise an inference that the prosecutor used peremptory challenges to exclude a member from the jury because of their race. *See Batson*, 106 S.Ct. at 1723. In addition, in this case no direct testimony was ever elicited from the prosecutor. The defendant did not show the relevance, if any, of the prosecutor's testimony to the defendant's claim of discrimination.

In this case, the defendant is a member of a cognizable racial group. The record reflects that the State's attorney exercised two peremptory challenges to remove jury panel members who were of the same race as the defendant's.

The defendant did not offer facts or circumstances that raised an inference that the peremptory challenges were racially motivated so no prima facie case of discrimination was raised. The defendant complains that the State's peremptory challenge to Juror No. 35 was for racially discriminatory reasons. The record reveals four separate discussions between Juror No. 35 and the prosecutor.

The first discussion involved a question directed to the jury panel concerning any physical problems that might make it difficult to sit for periods of time and listen to the evidence in the trial. Juror No. 35 indicated that she took medication for diabetes and might become sleepy, although she usually worked eight hours a day.

In the second discussion, the prosecutor asked Juror No. 35 to state her husband's occupation. She stated that she was unaware of his present occupation because they had been separated for a long time. The prosecutor responded, "Don't know and you don't care, right?" Juror 35 made no response. Other members of the venire panel were also questioned about the status of their spouses.

The third discussion began when the prosecutor asked the jury panel if anyone had any moral, religious, or conscientious reasons preventing them from sitting in judgment of another person. Juror No. 35 indicated that her religion would not allow her to swear to a required oath, but that she would be able to tell the truth. She also indicated that she could not sit in judgment of someone if it involved a judgment of death. (The range of punishment in this case was five years to life).

The fourth discussion was outside the hearing of the other jurors. The question asked by both the judge and the prosecutor focused on Juror No. 35's religious beliefs and how those beliefs affected her ability to take an oath. Juror No. 35 emphasized that she would only take the oath as directed by the judge if she could affirm the oath, rather than swear to it.

Three people indicated they had medical reasons that might prevent them from being effective jurors, including Juror No. 35. Of those jurors, two were dismissed for cause and Juror No. 35 remained on the panel. Of the three people who indicated they might have moral, religious, or conscientious problems, one was released for cause. The state used its peremptory challenges to strike the two remaining jurors (including Juror No. 35).

The State struck a cross section of jurors, including jurors who were single, married and divorced. No evidence was offered to prove that past conduct of the prosecutor indicated the use of peremptory challenges to strike a prospective juror in a racially discriminatory manner. The record reflects that the State used eleven out of twelve peremptory jury challenges. Only two black jurors were struck by the State. The State did not strike all the veniremen of defendant's race. One black venireman remained on the jury. This evidence does not raise an inference of purposeful discrimination.

In addition, there was no direct testimony elicited from the prosecutor. During the *Batson* hearing, the court asked, "Does the state wish to present evidence?" The State called Ms. Becak, the prosecutor, to testify. After the prosecutor was sworn in, the court stated; "Ms. Becak, it's the Court's intent that the Court will inquire of Ms. Becak in regard to certain matters." The court then requested the prosecutor to explain her reasons for using her peremptory challenges, including the challenge used against Juror No. 35. No other State attorney conducted a direct examination of the witness. The defense asked, "May I inquire of Ms. Becak?" The court replied, "I'm sorry, I will not allow cross-examination of the Assistant District Attorney. If you have further evidence to present, Mr. Anderson or Mr. Jagmin, I'll hear that."

The defense attorney failed to state for the record any questions that they desired be asked of the prosecutor in order to show any relevance of the prosecutor's testimony to the defendant's claims of discrimination. The defense attorney did not attempt to call Ms. Becak as an adverse witness in their offer of proof. The court merely disallowed cross-examination of Ms. Becak after the court's inquiry of the prosecutor. Defendant's point of error requesting cross-examination was not properly raised by the defense attorney in court and, therefore, was not preserved for appeal. TEX. R.APP.P. 52.

In conclusion, there was no inference of racial discrimination raised by the defendant and no prima facie case of discrimination established. No direct testimony was

elicited from the prosecutor. The request for inquiry of the prosecutor was not timely made by the defendant. Thus, the defendant was unable to show the relevance, if any, of the prosecutor's testimony to the defendant's claims of discrimination. No bill of exception was presented. Ultimately, the defendant did not preserve any error for appeal.

For these reasons, the prosecutor was not under a legal obligation to give reasons for using her peremptory challenges. *See Batson,* 106 S.Ct. at 1723. Therefore, the trial court's exercise of discretion disallowing defendant's inquiry of the prosecutor at the time it was requested was not an abuse of discretion. *See Batson,* 106 S.Ct. at 1725.

Because I would hold there was no abuse of discretion, I would overrule appellant's fifth point of error.

WHITTINGTON, Justice, dissenting.

I join in Chief Justice Enoch's dissent except that portion which attributes to the majority opinion the proposition that a defendant may compel the prosecutor to explain his exercise of peremptory strikes before the defendant has made a prima facie showing of unlawful discrimination. I understand the majority opinion to restrict such questioning to instances in which the defendant has *already* established a prima facie case.